**MID–SOUTH TOWING COMPANY, Plaintiff-Appellee,**

v.

**HAR–WIN, INC., et al., Defendants-Appellees,**

v.

**OKC CORPORATION LIQUIDATING TRUST, Defendant-Appellant.**

No. 82–3680.

United States Court of Appeals, Fifth Circuit.

June 4, 1984.

Charles L. Stern, Jr., Phillip A. Wittmann, New Orleans, La., for defendant-appellant.

Robert I. Siegel, Donald A. Hoffman, James R. Holmes, New Orleans, La., for Har-Win, Inc.

J. Kelly Duncan, New Orleans, La., for Mid-South Tow.

Before BROWN, THORNBERRY and TATE, Circuit Judges.

JOHN R. BROWN, Circuit Judge:

This is an appeal from the District Court's enforcement by summary judgment of an agreement to settle a case pending before the Court. The defendant OKC contends that the agreement was invalid for two reasons: (1) OKC's attorney, although believing he had authority to settle the case, actually did not have authority, and (2) even if counsel had authority, the settlement was based on a mistake by OKC regarding the existence of certain evidence. As to the second issue, we hold that if there was a mistake, it was at most a unilateral mistake of fact, which standing alone does not vitiate the settlement. However, because there remained an issue of material fact regarding whether OKC's attorney actually had authority to settle, summary disposition was inappropriate, and we remand for an evidentiary hearing on that issue.

## Facts

In June, 1979, Mid-South Towing Corporation (Mid-South) chartered ten of its barges to Har-Win, Inc. (Har-Win), who in turn subchartered them to OKC.[1] Surveys of the barges were performed by various surveyors both at the beginning and end of the charter. When the barges were returned by Har-Win to Mid-South at the end of the charter period, Mid-South claimed that they had been damaged since delivery to Har-Win and that under the terms of the charter Har-Win was responsible for the expenses of repairs. Mid-South had the repairs made at a cost of about $230,000.

## The Gathering Storm

Mid-South filed a complaint against Har-Win in the Eastern District of Louisiana,

---

1. Since the filing of the complaint, OKC Corporation has begun a process of voluntary liquidation. Any liability which may result from an adverse ruling in this case will be the responsibility of its successor-in-interest, the OKC Corporation Liquidating Trust. Both the corporation and the trust are referred to as "OKC."

seeking to recover the repair costs, lost charter hire, and survey costs, interest and costs. Har-Win denied liability and filed an admiralty third-party claim under F.R. Civ.P. 14(c) against OKC, who denied any liability to either Mid-South or Har-Win. American Employers' Insurance Company (American Employers'), from whom OKC and Har-Win had obtained a hull policy covering the barges, agreed to defend Har-Win and OKC to the extent of the hull policy's coverage. Har-Win later dismissed the third-party claim against OKC, without prejudice to Mid-South's claim against OKC.

In late August, 1982, Jerry Sawyer, a Dallas, Texas attorney who had been retained by OKC one month earlier to oversee some of its ongoing litigation, learned that potential conflicts existed between OKC and American Employers' with regard to the extent of insurance coverage and the scope of the hull policy deductible. Following a review of OKC's file in the matter, Sawyer forwarded a copy of that file to the New Orleans law firm of Stone, Pigman, Walther, Wittmann & Hutchinson and requested that the firm take the necessary steps to protect OKC's interests. OKC still looked to American Employers' to defend against the merits of the main claim by Mid-South. OKC's New Orleans counsel's duties were limited to monitoring the litigation and representing OKC's interest in any disputes that might arise with American Employers.

### Their Finest Hour

Beginning on August 26, 1983, Mid-South, American Employers' and New Orleans counsel for OKC engaged in negotiations for a full and final settlement. Much of this negotiation was between OKC and American Employers' concerning their respective contributions to a settlement with Mid-South. During these negotiations, Sawyer believed that he had authority to settle on behalf of OKC, and Sawyer was informed of and formally approved all actions by the New Orleans counsel whom he had employed. Moreover, Mid-South, American Employers', and OKC's New Orleans counsel were led to believe that Sawyer had authority to settle for OKC.[2]

On September 20, 1982, American Employers' and OKC's New Orleans counsel offered Mid-South $150,000, with $100,000 to be funded by OKC[3] and $50,000 by American Employers'. Mid-South accepted this offer by phone the next day. The District Court was immediately notified and in response cancelled the trial scheduled for October 4, 1982. For one pristine moment everyone was happy.

### An Attorney's Nightmare

An ominous rumble descended from the lofty heights of the OKC corporate hierarchy. When Sawyer presented the settlement to OKC management, he was informed that he was mistaken in believing that he had authority to make a settlement *of this magnitude.* Such settlement had to be approved, he was told, by Charles Redwine, Trustee, and his advisors. Sawyer passed this message on to his dismayed local counsel in New Orleans. On September 28, 1982, the District Court was informed of this unsettling news. The storm had broken; but, as to the nightmare, the attorneys had not awoken.

Mid-South filed a motion for summary judgment to enforce the compromise settlement, supported by copies of the various settlement negotiation letters. Arguing in support of the motion, American Employers' deposited in the Registry of the Court its settlement contribution of $50,000. In

---

**2.** The settlement letters by OKC's New Orleans counsel, contained phrases such as "OKC is willing to offer ..." and "I have conferred with OKC's general counsel ..."

**3.** There can be no question that this was a reasonable settlement from OKC's point of view. This represented a concession by American Em-

ployers', who contended that the hull policy provided for a $10,000 deductible for each of the ten barges. As an insured, OKC would have been liable for the deductible. The additional claim by Mid-South for $28,000 of lost charter hire was also not covered by the hull policy as interpreted by American Employers'.

opposition to the motion, OKC filed an affidavit by Sawyer. In the affidavit, Sawyer admitted that the attorneys, with his knowledge and consent, had agreed to the settlement. He also stated that although he is not an employee of OKC, he had "assisted" OKC "in overseeing some of its litigation." He expressly admitted that he believed that at the time the agreement was made he was "vested with full authority to settle this lawsuit on [OKC's] behalf without seeking approval from higher-level management." However, he stated that "when I presented the settlement to the Trust's management, I learned that I was mistaken and that settlements of the magnitude involved in this case had to be approved by Charles Redwine, Trustee, and his advisors."

As an alternative basis for attacking the settlement, Sawyer argued that he would not have approved the settlement if he had known at that time of the existence of several additional surveys of the barges performed at the end of the charter. He argued that these surveys were more favorable to the positions of OKC and American Employers', and thus the settlement was invalid because based on a mistake of fact.

The District Judge did not hold an evidentiary hearing on the motion, but heard arguments. He took a dim view of the assertions of OKC and Sawyer that Sawyer did not have the authority required by the corporation's internal policies, but he concluded that OKC's New Orleans counsel had "acted in positive, absolute good faith." The District Court declared that he was "firmly of the opinion that the New Orleans attorney had the authority to compromise the case," and that "it is simply a case of a corporate defendant trying to get out of settlement by getting counsel [Sawyer] to say that he didn't know what the internal policies were concerning authority." The motion to enforce the settlement was granted by summary judgment.

### Settling Down

A District Court has the power to enforce summarily a settlement agreement reached in a case pending before it. *E.g., Strange v. Gulf and South American Steamship Company*, 495 F.2d 1235, 1237 (5th Cir.1974). Questions regarding the enforceability or validity of such agreements are determined by federal law—at least where the substantive rights and liabilities of the parties derive from federal law. *Fulgence v. J. Ray McDermott & Co.*, 662 F.2d 1207 (5th Cir.1981) (Title VII); *Strange v. Gulf and South American Steamship Company*, 495 F.2d 1235 (5th Cir.1974) (general maritime law); *Cia Anon Venezolana De Navegacion v. Harris*, 374 F.2d 33 (5th Cir.1967) (general maritime law). *See also Harmon v. United States*, 59 F.2d 372, 373 (5th Cir.1932). Because the claims in this case are premised on federal general maritime law, we apply federal law to decide the validity of the agreement to settle the claims.

Mid-South and American Employers' contend that they were entitled to summary judgment on the settlement even if one accepts as true Sawyer's averment that he was mistaken in believing he had authority to settle this case. They argue that the internal policies of OKC, which were not made known to them or to OKC's New Orleans attorney are immaterial to the validity of the settlement where the opposing parties have relied on counsel's assertion that he had authority to settle for his corporate client. In support of this proposition, Mid-South cites *Cia Anon Venezolana De Navegacion v. Harris*, 374 F.2d 33 (5th Cir.1967), which is factually similar to this case.

In *Cia Anon*, a suit was brought in federal court based on maritime law. Counsel for defendant negotiated and agreed to a settlement, indicating to opposing counsel that he had authority from his client to settle. The imminent trial date was cancelled. Soon after, counsel for defendant contacted the plaintiff to inform him that the defendant client was asserting a lack of authority for the settlement. The plaintiff filed a motion to enforce the settlement agreement. The District Court

heard testimony and received affidavits on the question of whether counsel for defendant had authority to settle. The defendants filed an affidavit averring that the defendant's claims manager, who had been working with counsel on the case, had purported to give authority to counsel without obtaining the permission of higher corporate officials as required by the defendant's internal policies. The District Court considered this lack of compliance with the internal chain of corporate authority to be immaterial where neither counsel nor opposing party was made aware of the lack of authority of the corporate employee with whom they dealt. Thus, the District Court found that counsel did have authority, and enforced the settlement by summary judgment.

On appeal, we construed the District Court proceeding not as a motion for summary judgment, but as "a hearing by the District Court in the exercise of its inherent power to summarily enforce settlements entered into by parties litigant in a pending case." 374 F.2d at 36. We affirmed the District Court's judgment, reasoning, and procedure. We reasoned:

> In effect, the argument is that counsel had no right to rely on any authorization received from the claims representative of Appellant with whom he had handled the case for almost two years; and in turn, counsel for the other parties to the litigation could not rely on the representation of Appellant's counsel as to his authority. If such a position is meritorious, an attorney could never rely on the word of opposing counsel in determining authority. Especially would this be true in the case of a corporate defendant. Such a result would strike at the very basis upon which attorneys and litigants have compromised their differences for decades. Here, making the settlement for their client, we have the company's claim agent who had a complete familiarity with all the matters in controversy, and the able counsel engaged to handle the litigation. Surely, such a settlement should not be overturned because of certain alleged policies within Appellant's

office which were unknown to its counsel or to its claims manager.

374 F.2d at 35–36. Thus, although we discounted undisclosed corporate internal authorization requirements, we adhered to the requirement that counsel be given authority to settle by someone in the corporate organization. We affirmed on the basis of the factual finding, arrived at after an evidentiary hearing, that counsel had been given authority by the client.

This requirement of authority was explained in *St. Amand v. Marriott Hotel, Inc.*, 430 F.Supp. 488 (E.D.La.1977), which this Court affirmed with reference to the opinion of the District Court. 611 F.2d 881 (5th Cir.1981). Judge Rubin, then District Judge, declared:

> The law is settled that an attorney of record may not compromise, settle or consent to a final disposition of his client's case without express authority.... However, this general principle must be considered in connection with the rule that an *attorney of record is presumed to have authority* to compromise and settle litigation of his client, and a judgment entered upon an agreement by the attorney of record will be set aside only upon *affirmative proof* of the party seeking to vacate the judgment that the attorney had no right to consent to its entry.

430 F.Supp. at 490 (*quoting Thomas v. Colorado Trust Deed Funds, Inc.*, 366 F.2d 136, 139 (10th Cir.1966)) (emphasis added). *See also United States v. Texas*, 680 F.2d 356, 370–71 (5th Cir.1982).

■ Although a district court has inherent power to enforce an agreement to settle a case pending before it *summarily*, when opposition to enforcement of the settlement is based not on the merits of the claim but on a challenge to the validity of the agreement itself, the parties must be allowed an evidentiary hearing on disputed issues of the validity and scope of the agreement. *Autera v. Robinson*, 419 F.2d 1197, 1200 (D.C.Cir.1969). This was the procedure which was followed and ap-

proved by this Court in *Cia Anon,* and our decision in that case relied on a factual finding made after the hearing. 374 F.2d at 36. *See also Mull v. Marathon,* 658 F.2d 386 (5th Cir.1981); *Harmon v. United States,* 59 F.2d 372, 373 (5th Cir.1932).

■ The difficulty with the decision below is that the District Court effectively made a factual finding that Sawyer actually had been given authority to settle, without holding an evidentiary hearing. The affidavits and arguments of counsel still left this factual question in dispute. Although the admission by Sawyer that he believed he had authority to settle the case is highly probative of whether he actually was given authority, it is not conclusive. *See St. Amand,* 430 F.Supp. at 489. However, the mere fact that officers of OKC informed Sawyer after agreement had been reached that the settlement was not authorized does not "affirmatively prove" that Sawyer had not been given authority at an earlier time by some authorized person in the OKC organization. If the District Court finds that in effect Sawyer was given authority by someone in OKC without having been informed that final approval could only be made by others, then *Cia Anon* is directly applicable, and enforcement of the settlement would be proper.

The reasoning in *Cia Anon* and *St. Amand* suggest other possibilities for a finding in this case that Sawyer had authority to settle for OKC. Implicit in the *Cia Anon* holding is the idea that the defendant had clothed its claims manager with apparent authority to settle the case and had caused the opposing parties to rely on that appearance, and were therefore estopped from denying that the claims manager had authority. Only in light of such reasoning does the Court's emphasis on the reliance of opposing counsel and the internal nature of the break in the corporate authorization become relevant. *See*

*Cia Anon,* 374 F.2d at 35–36 (quoted *supra*); *St. Amand,* 430 F.Supp. at 491.[4]

In this case, the District Court may explore the possibility that OKC clothes Sawyer with authority to settle this case by giving him a general authority to settle cases assigned to him, without making Sawyer aware of specific limits on that authority. Sawyer's affidavit states that he learned after agreeing to settle that he had not been given authority to settle case "of the magnitude involved in this case." This is an implied admission, *see Cia Anon,* 374 F.2d at 35, that Sawyer had *some* authority to settle OKC's cases. A possible factual inquiry may thus concern whether OKC created such an ambiguity in the authority given to Sawyer as to estop OKC's argument that the authority did not extend to cases "of the magnitude involved in this case."

### The Morning After

■ As an alternative basis for attacking the validity of the settlement, OKC argues that even if there was authority, the agreement was based on a mistake of fact. Specifically, OKC alleges that Sawyer had been unaware of the existence of two additional surveys of the barges that had been performed after the end of the charter period, and that he would not have approved of the settlement if he had known of them. Mid-South answers this attack by arguing that OKC did know of the additional surveys, that they were not more favorable to OKC than the surveys of which OKC was aware, and because in any case a settlement agreement cannot be avoided based on a simple unilateral mistake of fact. Because we agree that a unilateral mistake of fact is not a basis for avoidance of a settlement agreement, we do not reach Mid-South's other arguments.

"Compromises of disputed claims are favored by the courts." *Cia Anon,* 374 F.2d at 35 (*quoting Williams v. First National*

4. *St. Amand,* in finding that there was no authority for the settlement before it, pointed out that "the plaintiff did not approve the settlement, nor do anything to ratify it *or to estop*

*himself from denying his counsel's lack of authority ...*" 430 F.Supp. at 491. (Emphasis added).

*Bank,* 216 U.S. 582, 30 S.Ct. 441, 445, 54 L.Ed. 625 (1910)); *J. Kahn and Co. v. Clark,* 178 F.2d 111, 114 (5th Cir.1949). "One who attacks a settlement must bear the burden of showing that the contract he has made is tainted with invalidity, either by fraud practiced upon him or by a mutual mistake under which both parties acted." *Callen v. Pennsylvania Railroad Co.,* 332 U.S. 625, 630, 68 S.Ct. 296, 298, 92 L.Ed. 242 (1948), *quoted in Asberry v. United States Postal Service,* 692 F.2d 1378 (C.A. Fed.1982).

In *Strange v. Gulf & South American Steamship Company,* 495 F.2d 1235 (5th Cir.1974), we rejected a longshoreman's opposition to enforcement of a settlement agreement between him and the shipowner-defendant in the pending action. The longshoreman claimed the agreement was based on a mutual mistake by the parties concerning his medical condition at the time of the settlement. Thus, the alleged mistake went to the strength or value of the plaintiff's case on the merits. We held that because the parties negotiated at arms-length and there was no taint of "fraud, deception, coercion or overreaching," the settlement was binding, despite a claim of mutual mistake. We explained:

> There would be little security in the settlement of a personal injury claim if the binding effect of such a settlement depended upon the certainty of the extent and outcome of the injuries involved. It is the very consequences of these uncertainties which the parties seek to foreclose by settlement and to take their chances on their outcome.

495 F.2d 1237. *Accord Harmon v. United States,* 59 F.2d 372 (5th Cir.1932).

In this case, OKC's alleged ignorance of the additional surveys is, at most, a unilateral mistake. There is no claim that either Mid-South or American Employers' concealed these other surveys or misrepresented their contents, nor that there was any overreaching. Moreover, the mistake that OKC complains of is the same type of mistake held to be immaterial in both *Strange* and *Harmon.* Thus, the District Court correctly rejected mistake by OKC as a defense to the enforcement of the settlement.

Accordingly, our remand is for the narrow purpose of providing OKC with an evidentiary hearing in which OKC will have the burden of proof, *see* 332 U.S. at 630, 68 S.Ct. at 298; 430 F.Supp. at 490, on the factual question of whether Sawyer did not actually have authority to settle the case.

AFFIRMED IN PART; REVERSED AND REMANDED IN PART.