Margaret T. ALLEN, etc., et
al., Plaintiffs,

Board of Trustees for Alabama State
University; and Eria P. Smith,
Plaintiff-Intervenors,

v.

The ALABAMA STATE BOARD OF
EDUCATION, et al., Defendants.

Civ. A. No. 81–697–N.

United States District Court,
M.D. Alabama, N.D.

Feb. 5, 1986.

Supplemental Memorandum
Feb. 25, 1986.

Donald V. Watkins, Watkins, Carter &
Knight, Montgomery, Ala., James U.
Blacksher, Gregory B. Stein, Blacksher,
Menefee & Stein, Mobile, Ala., Solomon S.
Seay, Jr., Terry G. Davis, Seay & Davis,
Montgomery, Ala., for plaintiffs.

Charles Coody, Gen. Counsel, Montgom-
ery, Ala., for defendants.

T.W. Thagard, Jr., David Boyd, Balch,
Bingham, Montgomery, Ala. for Ala. State

Bd. of Educ., Tyson, Creel, Cherry, Higginbotham, Poole, Martin, Allen, Roberts and Teague.

Algert Agricola, Patrick Robinson, Rosa Davis, Asst. Attys. Gen., Montgomery, Ala., for Bd. of Educ. and Teague.

## MEMORANDUM OPINION

MYRON H. THOMPSON, District Judge.

This class action lawsuit charges, among other things, that the State of Alabama's teacher certification tests impermissibly discriminate against black persons seeking teacher certification. The plaintiffs and plaintiff-intervenors are four black teachers and a predominantly black state university. The plaintiff class, as certified by the court to be represented by three of the plaintiff black teachers, consists of all black persons who have been or will be denied any level teacher certification because they failed to pass the tests. The defendants are the Board of Education for the State of Alabama, the members of the board, and the State Superintendent of Education.

In a series of orders, this court found that the parties had entered into an enforceable settlement and the court approved the settlement for the plaintiff class. This lawsuit is again before the court on the defendants' November 4, 1985, motion for rehearing, seeking to have the court reconsider its finding that the parties entered into a binding settlement. For reasons that follow, the court has concluded that the motion should be granted and the earlier orders enforcing and approving the settlement vacated.

## I.

The settlement provides for significant class-wide injunctive relief. It provides for a new certification process that allows the use of scores on newly developed subject area examinations as well as the candidates' grade point averages in their education programs. Under the proposed procedure, if candidates do not make the required cut-score on the tests, their grade point averages will be counted 50% and their test scores counted 50% to determine certification.

The new subject area examinations will be developed in accordance with several underlying provisions. First, the tests must meet applicable professional guidelines. Second, the development, administration, and continued review of the tests will be monitored by a three-person expert panel, whose members will be appointed by the court after nomination by the parties. Third, the test items will be subject to limits in permissible differences in result on the basis of race. Under the formula proposed, the tests would first use only items on which there was less than a 5% difference in performance by race. Where these items are not available, items on which there is a 10% or less difference in performance by race would be used. After the test is administered a number of times, items which were not thought to have a race difference of greater than 10% but did in practice have a difference of greater than 10% and less than 15% may be used so long as not more than 10% of the items fall into that category. Items which have a race difference of greater than 15% will not be used.

Defendants may continue to use the existing subject area examinations only until the new tests are developed and implemented, subject to the following strict controls: the cut-scores will be lowered 12 points; all class members who do not meet the lowered cut-scores will have their grade point averages counted 50% and the test counted 50% to determine certification; and finally, if the former two adjustments do not result in a black pass rate equal to 90% of the white pass rate, an additional number of the most highly qualified class members will be certified to make those pass rates come within 10%.

Further, use of a "basic professional studies" examination will be halted. Any candidates seeking advance certification in the same area as their basic certification will not be required to pass any examination.

In addition to these class-wide provisions, the settlement offers individual injunctive and monetary relief. The state board immediately will issue certifications to four categories of class members: (a) those who were denied certification on the basis of the previously administered basic professional studies examination; (b) class members who were denied a higher level of certification in the same field for which they held a basic certification; (c) class members who scored within 12 points of the cut-score on the prior examinations; and (d) class members who would have scored within 12 points of the cut-scores on the prior examinations if their grade point averages and test results had each been counted 50%.

Additionally, the settlement requires the state to pay $500,000 in liquidated compensatory damages to class members who were denied certification solely on the basis of the basic professional studies examination, who were denied higher certification in the same field for which they hold a basic certification, or who scored within 12 points of the cut-score or would have made such a score had their grade point averages been counted. The four individual named plaintiffs will be awarded $5,000 each, and then each class member, including the individual named plaintiffs, will take an equal, pro rata share of the remainder of the $500,000 fund.

## II.

The defendants continue to question whether the board members present at an April 4, 1985, meeting in Birmingham, Alabama agreed to the settlement. The court remains convinced that the members did. As the court observed in its July 3, 1985, memorandum opinion,

> Beginning in June 1984, attorneys for the parties met several times to discuss settlement of this lawsuit. Also present at some of these meetings were some of the parties' experts and some of the defendants themselves, including the state superintendent and a member of the state school board. In December 1984, the lawyers for the parties concluded

that they were unable to reach a settlement and so notified the court. The court then set a trial date of April 22, 1985.

In early 1985, settlement discussions resumed. During these renewed negotiations, Donald Watkins, the attorney for the plaintiffs, Gregory Stein, the attorney for the plaintiff-intervenors, and Charles Coody, the attorney for the defendants, exchanged eight to ten proposed settlement agreements in the form of consent decrees. Finally, on April 3, after working late into the night the previous day, Coody and Watkins drafted a consent decree that they believed would be acceptable to all parties.

The state board had previously passed a resolution authorizing the state superintendent to settle all litigation involving the board, with one exception not applicable to the circumstances here. Although superintendent Teague believed the final draft reached by Coody and Watkins was acceptable, he considered the settlement too important to accept without the approval of the board. Teague and Coody therefore called a meeting of the board to discuss the proposed consent decree and to secure approval from the board. Five of the eight board members met on April 4. A sixth board member attended briefly but left before the meeting ended. At this meeting, Teague and Coody informed the board members, in substance, that counsel for the parties had drafted a consent decree and that they, Teague and Coody, wanted the board's approval of the decree. Teague and Coody handed out copies of the decree to the board members, explained its major provisions, and answered questions. During the meeting, Teague and some board members expressed displeasure with various specific provisions in the decree; however, none of the board members voiced objections to settlement according to the terms in the decree. At the end of the meeting, Harold Martin, the presiding officer, told Teague to "go ahead" with the settlement. There was no objection from the other members of the board. The

evidence reflects that Teague, Coody and the five board members present at the meeting left the meeting with the understanding that they had approved the settlement as embodied in the decree. They further understood that Coody would immediately inform plaintiffs' and plaintiff-intervenors' counsel and the court that the decree was acceptable to the board and the superintendent and that the lawsuit was settled. Later the same day, Coody so informed Watkins and asked Watkins to inform Stein. Watkins did. On April 8, Coody and Watkins met with the court in-chambers. They presented the court with a copy of the decree they had drafted, and they informed the court that the case had been settled by all parties according to the terms in the decree. Stein could not be present for the meeting and had authorized Watkins to speak for the plaintiff-intervenors. The court informed Coody and Watkins that the settlement was acceptable, subject to the court's approving the decree for the plaintiff class pursuant to Rule 23(e) of the Federal Rules of Civil Procedure. The court also informed Coody and Watkins that a Rule 23(e) hearing would be set for June 28, 1985. The court continued the April 22 trial date. A few days later, the Attorney General for the State of Alabama publicly attacked the settlement. Then, on April 11, 1985, in response to public criticism of the settlement, the board voted five to three to inform the court that the lawsuit was not settled.

*Allen v. Alabama State Board of Education*, 612 F.Supp. 1046, 1049–50 (M.D. Ala.1985) (footnotes omitted).

The defendants contend that the court in reaching the above findings of fact placed too much emphasis on the testimony of one board member, Harold Martin, the presiding officer of the board. They contend that the purpose of the meeting was solely to inform board members about the settlement and that approval of the settlement was not to be considered until the next board meeting. Defendants' November 8, 1985, brief, pp. 2–3. Their contentions are meritless. Admittedly, Martin did testify that the board members present at the April 4 meeting accepted the settlement. He stated that

> I think all expressed opposition to the settlement, but all agreed that under the circumstances the settlement was—the Consent Decree as it was written, recommended by Dr. Teague and as explained by Mr. Coody would be—I don't know what the word—we would do it. We would do—we would consent to this decree. In other words, I think there was opposition, but I think it was—the opposition was to various points in it. But overall, if this is the best we can do, then we will consent to it. And then we settled that idea. That's when I spoke up and said let the Judge take credit, and then we decided that we would all be parties to it and we would accept it as it was written.

Martin deposition, p. 22. However, others present at the April 4 meeting gave testimony that firmly supported the court's findings that the board members were aware that the purpose of the meeting was not only to inform board members but also to secure their authorization to proceed with the settlement, and that such authorization was given.

Superintendent Wayne Teague testified that he "recommended" the settlement to the board and the board "permitted" him to agree to it. His testimony was as follows:

A. The meeting concluded with—Mr. Pool left at noon, due to business at home, and the other members stayed, and after lunch, we came back and in very informal session, and we talked about a few minutes, and Dr. Martin, as I recall, made a statement similar to the fact that none of us like this thing; even Dr. Teague doesn't like all of it. However, go on and do the best you can with it.

Q. And when Dr. Martin made the statement, to the effect, go on and do the best you can with it, did any

Board member who was present object to your proceeding with the settlement?

A. No.

Q. And did you take that as permission or instruction to proceed with the settlement?

A. I took it to mean that while I had authority to settle cases, I did not choose to settle this one, being such a public issue, without their consent, and having not had a voice opposing the settlement, I assumed that meant to go ahead with it.

\* \* \* \* \* \*

Q. When you left that meeting, was it your understanding that the Board had given its approval to the settlement?

A. It was my understanding the Board did not tell me not to settle it.

Q. And you interpreted that as approval?

A. Yes, sir.

\* \* \* \* \* \*

A. My understanding was that because I had recommended the settlement and that I did not get instructions to the contrary that we were to file it, to file—to make the agreement.

Q. To consummate the agreement?

A. Consummate the agreement.

Q. And when you say you didn't get instructions to the contrary, instructions from whom?

A. The Board, the members—this was not a Board meeting. It was not official. But again, I felt like since there was not a majority of voice against it that I was instructed—not instructed, but permitted to go ahead and make the agreement.

Transcript of May 6, 1985, hearing, pp. 7–8, 9; Teague deposition, pp. 9–10.

Charles Coody, the board's attorney, similarly testified that he understood that the board "concurred" in the Superintendent's recommendation that the settlement be approved. His testimony was as follows:

A. It was my impression from the overall tone and tenor and course of the meeting that after discussions, and after Dr. Martin made a statement at the end of the meeting to the effect that he felt that there were a number of features in the consent decree that no one liked, but nonetheless, it was something that was best, under the circumstances, just to go ahead and do what you had to do. Based on that, and based on conversation with Dr. Teague, I informed you that the case was settled.

Q. After Dr. Martin made the statement to the effect to go ahead and do what you need to do, did any Board member voice opposition at that point?

A. Not that I recall.

\* \* \* \* \* \*

Q. One other thing I want to be clear about, when you made your representation to the Court, did you think you had the tacit approval of the Board members, as well as the authority under the May, '81 resolution?

A. I don't know what you mean by tacit. It was my judgment that I had the concurrence of the Board.

\* \* \* \* \* \*

Q. Let me ask you this about the concurrence of the Board; you made that statement an answer or two ago. No vote was taken. How did you ascertain that you had the concurrence of the Board?

A. Based on my overall impression of what transpired at the meeting.

Q. Did that include your observations of their demeanor, and what they said, and how they said it?

A. Certainly, yes.

\* \* \* \* \* \*

Q. Now, what was the basis for your representation to the Court and to me that the case was settled?

A. That I had been authorized to do so by my client.

Q. Which client?

A. Specifically, the State Superintendent of Education with, in my judgment, the concurrence of the State Board of Education.

\* \* \* \* \* \*

Q. Okay. Did Dr. Teague tell you you could represent to me and could represent to the Court that this matter was settled?

A. Mr. Watkins, I don't know that Dr. Teague put it in those terms, but Dr. Teague and the members of the Board understood that on Thursday—after the meeting on Thursday, April the 4th, that I would represent to opposing counsel and to the Court that the matter had been settled.

Q. And where would they have gotten that understanding?

A. Based on conversations which were had with them at the meeting on April the 4th.

Q. Explain to me what you mean by the concurrence of the Board as you use it in describing what your authority was to represent a settlement to me and the Court.

A. At the conclusion of the meeting on April the 4th, it was my firm recollection that the members of the Board and Dr. Teague understood that I would make the representations that the case had been settled to opposing counsel and to the Court.

Transcript of May 6, 1985, hearing, pp. 62–63, 64, 66–67; Coody deposition, pp. 35, 37–38.

Board member James Allen's testimony similarly refutes the defendants' contentions that the board members were to decide at a later meeting whether the settlement should be approved. He testified as follows:

Q. Did you understand that the case would be settled after you left that meeting?

A. I felt that it would; yes, I did.

Q. Did you give Mr. Coody or Dr. Teague any instructions not to settle it?

A. No, sir; I did not.

\* \* \* \* \* \*

Q. And when you left that meeting, you knew Mr. Coody would instruct the parties and the court that the case was settled?

A. I felt that he would, yes.

Q. Did any Board members ask Dr. Teague not to report to the Court or the parties that this case was settled?

A. Not that I'm aware of.

\* \* \* \* \* \*

A. I felt personally when I left—I don't remember his specifically saying, well, I'm going to go to the lawyers and get this thing settled, but I felt personally when we left that that would be the case.

Q. Why did you feel that?

A. Just from what was said and discussed and how the—how—of course, I think that—I think really that Dr. Teague and Mr. Coody wanted to settle and they were not told—I don't—you know, this is my impression—not told not to settle and, therefore, I assumed that they would proceed with settlement.

\* \* \* \* \* \*

Q. When that meeting adjourned, is it fair to say that you were under the impression that Mr. Coody would report to the parties and the Court that that case was settled?

A. That's fair to say that, yes.

\* \* \* \* \* \*

A. .... I do feel, though, that when he did come to the Board that he would have been obliged at that point in time to follow the wishes of the Board regarding this particular suit.

Q. And in summary terms, what were the wishes of the Board as ex-

pressed at that informal meeting on April the 4th?

A. Just as far as my feelings were concerned, I felt like that the suit was going to be settled when I left or when we adjourned, but, I mean, it was never stated anything like that. I just—from everything—all the discussions and everything, that's how I felt that the matter was left.

Transcript of May 6, 1985, hearing, pp. 25–56; Allen's deposition, pp. 11, 14–15.

Board member John Fulmer initially stated in his deposition that it was not his impression that Coody and Teague would proceed with the settlement after the April 4 meeting. He testified in his prehearing deposition as follows:

Q. Okay. When you left that meeting, was it your impression that Mr. Coody would proceed with the settlement of that case?

A. No, sir.

Fulmer deposition, p. 11. However, Fulmer's testimony changed dramatically when he was later called in open court. His testimony was as follows:

Q. Did you think the case was settled when you left the meeting?

A. I thought that they were going to settle it, yes, sir.

Transcript of May 6, 1985, hearing, pp. 56–57. Other deposition testimony by Fulmer similarly supports the conclusion that he thought the purpose of the meeting was for approval of the settlement, not just for information about it. He testified as follows:

Q. Did Dr. Teague ever discuss with you any opinion he may have as to whether he needed Board approval on this settlement?

A. I don't know. I can only assume that he thought he did or he wouldn't have called a meeting. But I—no, I don't think he expressed to me that he did.

Q. During the April 4th meeting, was he seeking Board approval or was he just informing the Board of the contents of the documents?

A. Since I had no preknowledge of some type of an agreement that the Board had with him that he could settle these things on his own, I thought he was seeking Board approval.

Fulmer deposition, p. 17.

Board member Sara Evelyn Pratt also initially testified that she did not understand that Coody and Teague were going to report to the court and opposing counsel that this case was settled. She testified in her deposition as follows:

Q. All right. Let me ask it again. Did you understand despite the frustration that you have identified that at the conclusion of that meeting, Mr. Coody would leave that meeting and notify the parties and the Court that this case was settled as far as the Alabama State Board?

A. No, I did not.

Q. You had no idea that Mr. Coody was going to notify the parties and the Court that this matter was settled?

A. I did not know.

Pratt deposition, p. 9. Also, upon examination by counsel for the plaintiffs in open court, Pratt continued to maintain that she was ignorant of any intent on the part of Coody and Teague to represent to the court and opposing counsel that this lawsuit was settled:

A. .... I did not understand that it was going to be settled immediately, because I had had no prior knowledge of the negotiations that had taken place.

     *     *     *     *     *     *

Q. But you knew at the end of the meeting that Mr. Coody was going to report that this case had been settled?

A. I really didn't know what he was going to do, because we had had meetings like this before, and I really didn't know what he was going to

do. I thought we had to have a vote before anything would be done.

\* \* \* \* \* \*

Q. Dr. Pratt, is it fair to say that the meeting on April 4th in Birmingham, in your understanding, was purely informational?

A. Yes.

Transcript of May 6, 1985, hearing, pp. 41, 43, 44. However, upon examination by the court itself, Pratt finally admitted that she understood that Coody and Teague were going to report back to the court that this case was settled, although she then took the position that the settlement was forced upon her. Her testimony was as follows:

BY THE COURT: What had to be done right then?

BY THE WITNESS: The we—that the Judge—that the lawyer had to do something about it right at that point, that he had to know at that meeting.

BY THE COURT: What did he have to know?

BY THE WITNESS: He wanted to report back—he wanted to—I really don't know what he was going to do. He was going to report back to the Court.

BY THE COURT: When was he going to report back to the Court?

BY THE WITNESS: I really don't know. I noticed Ms. Thomasson said he was going to report back that afternoon, but I guess I missed that.

BY THE COURT: But you knew that he had to do something right then?

BY THE WITNESS: Well, I knew that he was pushing something right then, but I still felt ...

BY THE COURT: Did you know what he was pushing for?

BY THE WITNESS: Well, it was more like telling us what we were going to have to do; they wanted to tell us that this is what we are going to do, and you know we just didn't have an alternative.

BY THE COURT: I don't understand. What did they say you were going to do?

BY THE WITNESS: Settle the case. We want to settle the case. We need to settle the case. We're making you aware of what we are doing. But when any opposition came up, that's not an alternative. This is not an alternative; We want to settle the case.

Transcript of May 6, 1985, hearing, p. 50. From this testimony it is apparent that Pratt's previous testimony that she was unaware of the settlement was untrue and was specifically intended to mislead the court. Her claim that she was unwillingly pushed into the settlement is undermined by her failure to be completely truthful with the court on other matters; it is also refuted by testimony from others that none of the board members present at the April 4 meeting requested that Coody and Teague not proceed with the settlement.

Only one board member present throughout the April 4 meeting consistently maintained that she did not understand that Coody and Teague would report to the court and opposing counsel that this case was settled. This board member is Isabelle Thomasson. However, in light of the testimony of the other four members present, the superintendent, and the board's attorney, the court does not find Thomasson's testimony credible.

The defendants correctly note that the board members never *voted* at the April 4 meeting to approve the settlement. Indeed, the evidence is clear that, while fully aware that their attorney was on his way to inform opposing counsel and the court that this case was settled, the board members specifically intended not to call for a vote. Several board members testified that they and other board members were careful to observe among themselves after the meeting that they had voted on nothing. The reason behind this scheme was aptly and succinctly put by board member Martin to board member Pratt. Pratt testified that "Dr. Martin said to me, 'Just tell your people up there in North Alabama that you

had nothing to do with it, and we'll blame the Judge.' " Transcript of May 6, 1985, hearing, p. 39.

However, although the court remains convinced from the evidence that the board members present at the April 4 meeting approved the settlement by knowingly and without objection allowing their attorney to inform opposing counsel and the court that this case was settled, the court must also conclude for reasons that follow that the settlement is not legally binding against the state school board.

### III.

#### A.

Federal courts have stated many times that federal policy favors settlement as a means of dispute resolution. *E.g., Bennett v. Behring Corp.,* 737 F.2d 982, 986 (11th Cir.1984). As a result, federal law does not require that the settlement be in writing and signed by the parties, *Allen v. Alabama State Board of Education,* 612 F.Supp. 1046, 1053 (M.D.Ala.1985); rather, an oral agreement is enforceable against a party where the party has knowingly and voluntarily agreed to the settlement or has authorized his attorney to do so. *Id.* Nor does federal law require that the attorney have written authority to settle a lawsuit, *id.;* it only requires that the attorney's authority be either "express," *id.,* or "apparent," *Mid-South Towing Co. v. Har-Win, Inc.,* 733 F.2d 386, 391 (5th Cir.1984).

The federal law on an attorney's authority to settle a lawsuit is derived for the most part from the law of agency. *Turner v. Burlington Northern Railroad Company,* 771 F.2d 341, 345 (8th Cir.1985). Agency law recognizes two broad categories of authority: actual authority and apparent authority. Actual authority results from manifestations from the principal to his agent that the agent has certain authority.

Restatement (Second) of Agency, §§ 7, 26 (1957). There are generally two types of actual authority: express and implied. *Id.* § 7. Apparent authority results from manifestations from the principal to a third person that the principal's agent has certain authority. *Id.* §§ 8, 27. Such manifestations may flow either directly from the principal to the third party or through an intermediary, such as the agent himself. *Id.* § 8. Thus, the same conduct by the principal may give rise to both actual and apprent authority. *Id.*

In the context of settlements, courts have interpreted the requirement that attorneys have the express authority of their clients to mean that the authority must be specific; that is, it is not incidental to and cannot be inferred from the general authority of the attorney to represent the client. *See, e.g., Crawford v. Tucker,* 64 So.2d 411, 416 (Ala.1952); *Birmingham Electric Co. v. Cochran,* 242 Ala. 673, 8 So.2d 171, 173 (1942); *Daniel v. Scott,* 455 So.2d 30, 32 (Ala.Civ.App.1984). This express or specific authority may be created by written or spoken words or the conduct of the principal. *Turner v. Burlington Northern Railroad Company,* 771 F.2d 341, 345 (8th Cir.1985).

Here, as a result of the April 4 board meeting, Coody, the board's attorney, had both express and apparent authority to settle this lawsuit. The evidence related above clearly reflects that the board, through its words and conduct, authorized its attorney to inform the court and counsel for plaintiffs and plaintiff-intervenors that this lawsuit was settled. Thus, the board manifested *express* authority to Coody and manifested *apparent* authority to the court and counsel for plaintiffs and plaintiff-intervenors that Coody could settle this lawsuit according to the terms of the consent decree. *E.g., Mid-South Towing Co.,* 733 F.2d at 391.[1]

---

1. In its July 3, 1985, memorandum opinion, the court also concluded that it had jurisdiction to enforce the settlement. The recent Eleventh Circuit decision of *Londono v. City of Gainesville,* 768 F.2d 1223 (11th Cir.1985), does not

change this result. There, the court held there was no jurisdiction to enforce the settlement because the "parties did not wish their settlement to be incorporated into a consent judgment or decree ...," *id.* at 1227; rather, the

### B.

If the parties here were all private and the subject matter merely of a private, nongovernmental concern, this court would readily enforce the settlement for the reasons given above. However, several additional factors present here convince the court that the above principles of law are not in all respects appropriately applicable here.[2]

The Supreme Court has repeatedly recognized that governments are not always subject to some rules applicable to private litigants. *See, e.g., Heckler v. Community Health Services of Crawford County, Inc.*, 467 U.S. 51, 60, 104 S.Ct. 2218, 2224, 81 L.Ed.2d 42 (1984) ("it is well-settled that the Government may not be estopped on the same terms as any other litigant"); *Utah Power & Light Co. v. United States*, 243 U.S. 389, 409, 37 S.Ct. 387, 391, 61 L.Ed. 791 (1917) ("suit by the United States to enforce and maintain its policy respecting lands which it holds in trust for all the people stands upon a different plane [as to laches or neglect of duty] from the ordinary private suit to regain the title to real property or to remove a cloud from it"). This difference is premised on the notion that, when a government is a litigant, "the interest of the citizenry as a whole" may be at issue. *Community Health Services of Crawford*, 467 U.S. at 60, 104 S.Ct. at 2224.

This difference becomes even more significant when the governmental entity is a state and the action is maintained in federal court. For, any decision of a federal court against a state must be informed by the "problems of federalism inherent in making one sovereign appear against its will in the courts of the other." *Employees of the Department of Public Health & Welfare v. Missouri*, 411 U.S. 279, 294, 93 S.Ct. 1614, 1622, 36 L.Ed.2d 251 (1973)

(Marshall, J., concurring). These problems of federalism are heightened where there has been no finding that the state has acted unconstitutionally or in violation of federal law.

Another factor setting this case apart from private litigation is the fact that the settlement will have such a broad and substantial impact on the public. The settlement will constitute a complete restructuring of the state teacher certification testing process and will require a substantial expenditure of state funds. The court is reluctant to conclude that a settlement of such widespread public impact and import could be enforced against a state by a federal court merely on oral representations and the inferences the court has drawn from these representations.

These factors or concerns lead the court to conclude that, where the claimed basis for substantial federal judicial intrusion in a state's operations is not evidence that the state has acted unconstitutionally or in violation of federal law but rather is an alleged settlement, there must be evidence of a formal, clear, and unequivocal declaration that the state has agreed to such intrusion before the settlement may be enforced. While not directly on point, the following language from *Edelman v. Jordan*, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974), implicitly teaches as much:

> In deciding whether a State has waived its constitutional protection under the Eleventh Amendment, we will find waiver only where stated "by the most express language or by such overwhelming implications from the text as [will] leave no room for any other reasonable construction."

*Id.*, at 673, 94 S.Ct. at 1360–61, *quoting Murray v. Wilson Distilling Co.*, 213 U.S.

---

settlement required that the case be dismissed. Here, the parties wanted the settlement to be incorporated into a consent judgment.

**2.** The evidence also reflected that the settlement was approved pursuant to the state board's resolution authorizing the state superintendent to settle certain litigation. The defendants have

challenged the validity of this resolution under state law. The court has not reached this state law issue in light of the court's finding that the school board itself approved the settlement.

However, even if the resolution is valid under the state law, the factors discussed in Part III B of this opinion would dictate the same result.

151, 171, 29 S.Ct. 458, 464, 53 L.Ed. 742 (1909); and

> [W]hen we are dealing with sovereign exemption from judicial interference in the vital field of financial administration a clear declaration of the state's intention to submit its fiscal problems to other courts than those of its own creation must be found.

*Edelman,* 415 U.S. at 673, 94 S.Ct. at 1361, *quoting Great Northern Life Insurance Co. v. Read,* 322 U.S. 47, 54, 64 S.Ct. 873, 877, 88 L.Ed. 1121 (1944) (footnote omitted).

■ Memorializing the settlement in a signed document would provide the formality appropriate where one government has agreed to substantial intrusion into its operations by another government; it would also be, at least, a first step toward removing any doubt that a government has agreed to such intrusion into its own operations.[3] This court therefore holds that, before a federal court may enforce a settlement of the magnitude presented here against a state, the settlement should, at a minimum, be reduced to a writing signed by the appropriate state officials or their agents.[4] *Cf. Newman v. Graddick,* 740 F.2d 1513, 1516–17 (11th Cir.1984) (consent decree concerning state prison system signed by plaintiffs' counsel and the appropriate state defendants is binding on incoming state officials in new administration). Here, the settlement was reduced to writing but was not signed by state officials or their attorneys. Under these circumstances, the settlement is not enforceable.

The court recognizes that the relatively lax federal requirements for enforcing settlements reflect a strong federal policy favoring settlements. However, this policy was developed for the most part in cases involving private litigants, and the court is convinced that it must be modified in light of the factors articulated above.

Counsel for the plaintiffs and plaintiff-intervenors have aptly pointed in their briefs to the words of the late Judge Richard T. Reeves that

> I look forward to the day when the State and its political subdivisions will again take up their mantle of responsibility, treating all citizens equally, and thereby relieve the federal Government of the necessity of intervening in their affairs. Until that day arrives, the responsibility for this intervention must rest with those who through their ineptitude and public disservice have forced it.

*Dent v. Duncan,* 360 F.2d 333, 337–38 (5th Cir.1966) (Reeves, concurring). The court is sensitive to these words and recognizes that the result it reaches today may well have the effect of punishing those state officials who in good faith took up "their mantle of responsibility" as well as the effect of rewarding those who sought to mislead the public, the opposing parties and their counsel, and the court. However, as observed above, the issue here is not solely the malfeasance and misfeasance of public officials; at issue also are the special factors or concerns discussed above, factors which the court is convinced dictate the result reached today.[5]

### IV.

Finally, the court recognizes that, but for the conclusion reached today, this litigation would be at an end in this court; and that with the conclusion reached today the ex-

---

**3.** Whether other requirements for an enforceable settlement should be more stringent when the state is a litigant is an issue the court need not reach at this time.

**4.** The requirement that the settlement be reduced to a signed writing before it is enforceable is, of course, subject to exceptions, as all general propositions usually are. One exception might be where the litigants have proceeded to place the settlement into operation. Another might be where the state litigant has knowingly and without objection allowed the federal court to order that the settlement be placed into effect.

**5.** The court also recognizes that, as a result of the settlement, plaintiffs and plaintiff-intervenors may, indeed, have been harmed by revealing certain aspects of their case to counsel for defendants. The court is convinced, however, that this harm, if any, was very small and does not outweigh those factors and concerns that dictate the result reached today.

penses and time expended by the plaintiffs and plaintiff-intervenors in obtaining court approval of the settlement pursuant to Fed. R.Civ.P. 23(e) will have been for nothing. The court also recognizes that its conclusion today is based on the resolution of difficult issues of first impression, issues of strong public as well as legal interest and significance; and that, if the court has incorrectly resolved these issues, the parties will have been put to an unnecessary trial of this expensive, complex, and difficult lawsuit. The court will therefore certify for immediate appeal the order entered today. The order will include the necessary findings for such appeal pursuant to 28 U.S.C.A. § 1292(b).

An appropriate order will be entered.

## SUPPLEMENTAL
## MEMORANDUM OPINION

In this class action lawsuit charging, among other things, that the State of Alabama's teacher certification tests impermissibly discriminate against black persons seeking teacher certification, this court first found that the defendant State Board of Education had entered into an enforceable settlement, *Allen v. Alabama State Board of Education (Allen I)*, 612 F.Supp. 1046 (M.D.Ala.1985), and the court then approved the settlement for the plaintiff class. The plaintiffs rest their charge on the fourteenth amendment and various civil rights statutes, including Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. §§ 2000e through 2000e–17.

After the State Board asked the court to reconsider its prior decisions enforcing the settlement, the court reaffirmed that the board had "approved the settlement by knowingly and without objection allowing their attorney to inform opposing counsel and the court that this case was settled." *Allen v. Alabama State Board of Education (Allen II)*, 636 F.Supp. 64, 72 (M.D. Ala.1986). However, relying on broad principles of federalism and sovereign immunity, the court concluded that the settlement could not "be enforced against the state by a federal court merely on oral representations and the inferences the court has

drawn from these representations." *Id.* at 73. "[W]here the claimed basis for substantial federal judicial intrusion in a state's operations is not evidence that the state has acted unconstitutionally or in violation of federal law but rather is an alleged settlement, there must be evidence of a formal, clear and unequivocal declaration that the state has agreed to such intrusion before the settlement may be enforced." *Id.* The court added that "memorializing the settlement in a signed document" would be "a first step toward removing any doubt that [the state] has agreed to such intrusion into its own operations." *Id.* at 74.

On further reflection, the court has concluded that these broad principles of federalism and sovereign immunity governing enforcement of settlements in which a state is a party can be further crystalized in the following manner.

■ "The Eleventh Amendment confirms 'that the fundamental principal of sovereign immunity limits the grant of judicial authority in Art. III.'" *Green v. Mansour*, — U.S. —, —, 106 S.Ct. 423, 425, 88 L.Ed.2d 371 (1985), *quoting Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 98, 104 S.Ct. 900, 906, 79 L.Ed.2d 67 (1984). As a general matter, then, a federal court has no direct judicial power over a state. "There are, however, certain well established exceptions to the reach of the Eleventh Amendment." *Atascadero State Hospital v. Scanlon*, — U.S. —, —, 105 S.Ct. 3142, 3145, 87 L.Ed.2d 171 (1985). This court's authority to enforce the settlement against state officials is, therefore, barred by the eleventh amendment unless the settlement falls within one of the exceptions to the reach of the amendment.

■ First, under the landmark case of *Ex parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), state officials who allegedly violate constitutional or statutory federal law may be sued in federal court for prospective injunctive relief only. *Pennhurst*, 465 U.S. at 101, 104 S.Ct. at

909. If the court ultimately finds that a federal law was violated in the past and continues to be violated, it may issue a prospective injunction to halt the continuing violation. *Green v. Mansour,* — U.S. at —, 106 S.Ct. at 428. Thus, a prerequisite for an *Ex parte Young* exception is a court finding that state officials have acted unconstitutionally or in violation of federal law. *See Pennhurst,* 465 U.S. at 105, 104 S.Ct. at 911 (*Ex parte Young* exception to eleventh amendment immunity does not apply when no violation of federal law is alleged).

Second, Congress can "abrogate the Eleventh Amendment without the States' consent" when, acting pursuant to the enforcement power conferred on it by section 5 of the fourteenth amendment, Congress clearly and unequivocally authorizes lawsuits against the states in federal court. *Atascadero State Hospital v. Scanlon,* — U.S. at —, 105 S.Ct. at 3145. When, for example, Congress amended Title VII in 1972 pursuant to its enforcement power under section 5 of the fourteenth amendment, it expressly abrogated state immunity from all relief, including retrospective backpay relief. *Fitzpatrick v. Bitzer,* 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976). With the amendment, "Congress ... authorized federal courts to award money damages in favor of a private individual against a state government *found* to have subjected that person to employment discrimination on the basis of 'race, color, religion, sex, or national origin.'" *Id.* at 447, 96 S.Ct. at 2667 (footnote omitted) (emphasis added). If a federal court therefore ultimately finds that a federal law abrogating eleventh amendment immunity has been violated by the state, it can fashion whatever relief is appropriate under that federal statute. Again, a prerequisite for federal judicial relief against a state under this exception is a finding that state officials have violated a federal law abrogating eleventh amendment immunity.

Here, the court has no power to enforce the settlement against the state under either of the two exceptions to eleventh amendment immunity discussed above. It has no power to enforce the settlement's prospective relief against the state under *Ex parte Young* because there has been no finding of a violation of federal constitutional or statutory law. Similarly, it cannot rely on Congress's abrogation of immunity under Title VII or similar laws because there has been no finding of a violation of Title VII or similar laws.

The only remaining possible basis for this court's enforcement of the settlement against state officials is a third exception to eleventh amendment immunity. Federal judicial power may extend to a state if the state waives its eleventh amendment immunity. However, a state will be deemed to have waived its immunity "only where stated 'by the most express language or by such overwhelming implication from the text as [will] leave no room for any other reasonable construction.'" *Edelman v. Jordan,* 415 U.S. 651, 673, 94 S.Ct. 1347, 1361, 39 L.Ed.2d 662 (1974), *quoting Murray v. Wilson Distilling Co.,* 213 U.S. 151, 171, 29 S.Ct. 458, 464, 53 L.Ed. 742 (1909). *See also Atascadero State Hospital,* — U.S. at — n. 1, 105 S.Ct. at 3145 n. 1 ("we require an unequivocal indication that the State intends to consent to federal jurisdiction that otherwise would be barred by the Eleventh Amendment"). Given clear and unequivocal consent to jurisdiction, federal judicial power could therefore extend to situations where no underlying violation was shown. Clear and unequivocal consent by a state to a settlement would therefore remove any barriers to enforcement erected by the eleventh amendment.

As the court concluded in its February 5, 1986, memorandum opinion, however, no such clear and unequivocal consent can be found on the facts of this case. Oral representations and inferences drawn from such representations are simply not enough. At the very least, a signed agreement should be required before a federal court could conclude that the state had given clear and unequivocal consent to waive its eleventh amendment immunity and subject its governmental operations to the control of a federal court. Absent a clear and unequiv-

ocal indication of such consent, the settlement cannot be enforced in federal court.

DONE, this the 25th day of February 1986.