923 F.2d 1024
 Fed. Sec. L. Rep. P 95,749
Charles A. TIERNAN, Jr., Richard Ray, Mary Jo Ray, Peter R.
Maynard, Gerald Traficante, Susan Traficante, Donald
Metzger, Gail Metzger, Albert Auricchio, Noel T. Hill,
Richard Cianfrocca, Steven M. Kahn, Robert Bernzweig,
Stephen C. Kiely, Paul Croxton, Valerie Croxton, Anthony
Annunziata, Louise Annunziata, Stephen Tobias, Jann Tobias,
Stuart Kandel, Gloria Kandel, Ralph Davidoff, Martin
Feldman, F. William Zimba, Thomas Lemberge, Stephen P.
Gudek, Sr., Miriam Friedland, Lawrence Friedland, Donald
Rosenzweig, Salvatore T. Salerno, G. Peter Nelson, Mary Lou
Nelson, Ernest J. Broadbent, James Andaloro, Arlene
Andaloro, Richard Troiano, Diane Troiano, Robert Infarinato,
Joan Infarinato, Harold Taub, Barbara Taub, Robert R.
Moheban, Joel Davidsen, Kendra Davidsen, Richard J.
Civitarese, Ralph J. Civitarese, and Joan A. Colucci
v.
Harry L. DEVOE, Jr., The Devoe Group, Ltd., Devoe Management
Co., Equity Performance Group, Inc., Sterling Securities,
Inc., Sterling Investor Services, Inc., Ann Soja, Martin
Soja, Rose, Feldman, Radin, Feinsod & Skehan, and Bishop,
Liberman & Cook.
Appeal of Charles A. TIERNAN, Jr., Richard and Mary Jo Ray,
Noel T. Hill, Salvatore T. Salerno, Ernest J. Broadbent,
James and Arlene Andaloro, Richard and Diane Troiano, Robert
R. Moheban, Joel and Kendra Davidsen, Gerald and Susan
Traficante, Albert Auricchio, Richard Cianfrocca, Steven M.
Kahn, Anthony and Louise Annunziata, Martin Feldman, F.
William Zimba, Stephen P. Gudek, Sr., Miriam Friedland,
Donald Rosenzweig, G. Peter and Mary Lou Nelson, Richard J.
Civitarese, and Ralph J. Civitarese.
 No. 89-2024.
 United States Court of Appeals,
Third Circuit.
 Argued May 16, 1990.
Decided Jan. 17, 1991.
 
 Marjorie Schaffner (argued), Stephen D. Sharp, Beigel & Sandler, Chicago, Ill., for appellants.
 Ronald J. Shaffer (argued), Fox, Rothschild, O'Brien & Frankel, Philadelphia, Pa., for appellees Equity Performance Group, Inc., Sterling Securities, Inc., Sterling Investor Services, Inc., Ann Soja, and Martin Soja.
 David H. Marion (argued), Montgomery, McCracken, Walker & Rhoads, Philadelphia, Pa., for appellee Bishop, Liberman & Cook.
 Charles W. Craven (argued), Audrey L. Jacobsen, Marshall, Dennehey, Warner, Coleman & Goggin, Philadelphia, Pa., for appellee Rose, Feldman, Radin, Feinsod & Skehan.
 Before MANSMANN and SCIRICA, Circuit Judges, and STANDISH, District Judge*.
 OPINION OF THE COURT
 SCIRICA, Circuit Judge.
 
 
 1
 This case involves a challenge to an order of the district court granting summary enforcement of several settlement agreements. Although we recognize the difficulties faced by the district judge in this confusing matter, we will vacate the order and remand to the district court for a determination of the validity of the settlements.
 
 I.
 A.
 
 2
 This lawsuit arises out of the collapse of a building renovation project in Philadelphia, Pennsylvania. In 1985, plaintiffs purchased limited partnership interests in a historically certified residential and commercial property located in Philadelphia (the "Malt House"). By April 1987, it was clear that the venture was failing and that the limited partnership was in default of its trade and mortgage obligations. As a consequence, 48 of the limited partners--a substantial majority of the limited partners investing in the underlying venture--created a "Limited Partners Committee" to "address the serious problems relating to (i) the construction, management, and economic viability of the project; (ii) possible legal redress against the General Partner and others[;] and (iii) the economic and tax impact upon the Limited Partners if the Partnership were to be dissolved, the General Partner were to resign or the Partnership were to lose its principal asset." The Agreement provided for the creation of a Limited Partners Executive Committee, which was authorized to, inter alia, "[i]nstitut[e] litigation determined to be in the best interest of the Partnership and defend[ ] litigation initiated by others against the Partnership; and ... [e]ngag[e] attorneys, accountants, appraisers and other professionals deemed necessary to assist in carrying out the objectives of the [Limited Partnership]." The Executive Committee retained attorney Michael Bloom to represent their interests.
 
 
 3
 In November, 1987, all members of the Limited Partners Committee filed suit in U.S. District Court seeking recovery from four groups of defendants: (1) the general partner in the project, and the entities that were to lease and manage the renovated property (the "Devoe Defendants"); (2) the placement and investor services agents for the project (the "Soja Defendants"); (3) the accountants who reviewed the financial projections for the project (the "Accountant Defendants"); and (4) the tax counsel for the project (the "Attorney Defendants"). The complaint included federal securities fraud and RICO claims and pendent state fraud and contract claims. The lawsuit blamed the project's failure on defendants' mishandling of the property's renovation and faulted the defendants for misrepresenting the financial prospects and tax benefits of the venture.
 
 
 4
 By October 20, 1988, all the defendant groups believed they had reached agreement with plaintiffs' attorney on the terms of settlement. In the settlements, the Soja Defendants agreed to pay $29,000, and to assign to plaintiffs their one-half interest in a second mortgage on property to be developed; the Attorney Defendants agreed to pay $35,000; the Accountant Defendants, $35,000; and the Devoe Defendants, $30,000. Plaintiffs contend, however, that these purported agreements were merely offers of settlement. It is this dispute that forms the basis of the appeal.
 
 
 5
 After plaintiffs rejected the purported settlement agreements in January, 1989, defendants moved to enforce the settlements. On June 1, 1989 the district court ordered the settlements enforced with respect to all the defendant groups except the Devoe defendants. After denying a motion for reconsideration, the district court issued an order declaring a release executed and directing defendants to deposit settlement proceeds into court.
 
 
 6
 Plaintiffs appeal from each of these rulings and raise three challenges to the district court's enforcement of the settlements. First, they assert that the district court should have held a hearing before enforcing the settlements. Second, they contend that there were no settlement agreements, because their attorney lacked authority and they never ratified his acts by failing to repudiate them. Third, they argue that there were no settlement agreements because the parties never reached agreement on whether plaintiffs could opt out.
 
 B.
 
 7
 Our decision turns on the nature and extent of the authority that plaintiffs gave their attorney and on his conduct towards the district court and the other parties to the litigation. Therefore, it is necessary to recite the details of those relationships.
 
 
 8
 We begin by examining the transcript of the June 1, 1989 conference before the district court which addressed the defendants' motion to enforce the settlement agreements. By this time, plaintiffs had retained a new lawyer, Stephen Sharp, who represented them after they had rejected the alleged settlements. At the conference, Sharp represented that settlement was first discussed among the plaintiffs in an August, 1988 meeting between Bloom and a member of the Executive Committee, Joel Davidsen. According to Sharp, Bloom explicitly told Davidsen that each partner would have to sign off individually and that no partner would be involuntarily bound to any settlement agreement. Bloom emerged from this meeting with authority only to "determine the best offer that would be made by the defendants." During settlement negotiations he spoke only to Davidson and never submitted any proposed agreements to plaintiffs. Sharp also contended that even if the Executive Committee had undertaken to settle the litigation, no settlement could have occurred because the Agreement did not grant the members of the Executive Committee authority to settle the other plaintiffs' claims. Sharp proffered the testimony of Davidsen and of Charles Tiernan, another Executive Committee member, to establish this version of events.
 
 
 9
 Bloom's correspondence to defendants and the district court, however, paints a different picture. On September 7, 1988, Bloom wrote a letter to the district court that stated:
 
 
 10
 I am pleased to report that following the last conference before the Court, the Plaintiffs authorized their counsel to initiate and thereafter participate in settlement negotiations with each of the three possible settling defendant groups (i.e., the Soja defendants, the attorneys, and the accountants). Based upon our preliminary discussions, we are cautiously optimistic that there may be a joint tortfeasor settlement reached with each of the three settling defendant groups. Additionally, there are ongoing discussions with counsel for the Devoe defendants which may give rise to a global settlement among all parties.
 
 
 11
 The letter also stated that a bank had initiated state-court foreclosure proceedings on the property.
 
 
 12
 On September 7, 1988, counsel for the Attorney Defendants wrote Bloom stating that "we accept plaintiffs' offer of settlement in return for a payment by us of $35,000."[1] Bloom did not object to this characterization. On October 11, 1988, Bloom wrote the Soja Defendants stating that "[t]his letter will confirm that the Plaintiffs[ ] have agreed to settle their claims, by way of final settlement or joint tortfeasor release, with the Soja defendants in consideration of the payment to plaintiffs of $29,000 together with the tender to plaintiffs of the Sojas' interest in the second mortgage." That letter also expressed optimism that a settlement would be reached with respect to the Devoe Defendants, "thereby giving rise to a global settlement."
 
 
 13
 On October 20, 1988, the parties had a settlement conference before the district court. After that conference, but on the same day, Bloom wrote a letter to all the defendants, with a copy to the district court, to correct a misstatement he had made at the conference. Bloom referred to the day's earlier proceedings as a "final settlement conference," and stated that he wished to correct a misstatement at the hearing regarding the amounts to be paid by the Attorney Defendants and the Accountant Defendants. On October 24, counsel for the Attorney Defendants wrote Bloom confirming Bloom's correction, and confirming other details of the settlements.
 
 
 14
 On November 4, 1988, Bloom wrote to the attorneys for all the defendants stating: "[e]nclosed for your information and review, please find a complete set of the proposed settlement documentation.... Assuming the documents are acceptable, we would like to complete execution of them as promptly as possible."
 
 
 15
 According to Sharp, Bloom was doing all this without authority and without plaintiffs' knowledge. It is undisputed, however, that on September 9 Bloom forwarded to the members of the Executive Committee[2] copies of the September 7, 1988 letter from the Attorney Defendants. Bloom sent this letter under cover of a memorandum stating "I am pleased to enclose a copy of the offer of settlement made on behalf of [the Attorney Defendants] in the Malt House litigation," even though the letter from the Attorney Defendants stated "we accept plaintiffs' offer of settlement." The Executive Committee, but none of the other plaintiffs, also received copies of the other letters that Bloom sent to defendants and the district court.[3]
 
 
 16
 At the conference on June 1, 1989, Sharp made an offer of proof. He contended that the first information on settlement negotiations received by plaintiffs who were not members of the Executive Committee was in an October 25, 1988 letter from Bloom to all plaintiffs. That letter is not in the record, and there is no testimony in the record describing its contents. He also contended that members of the Executive Committee would testify that they understood this as merely an offer. One of the Limited Partners who was not on the Executive Committee, Richard Troiano, objected to the terms some time in the first week of November, 1988. On December 2, 1988, Bloom wrote the district court of Troiano's objection, with copies to defendants' attorneys. On December 9, 1988, plaintiffs met with Bloom to consider the settlements. At that meeting, plaintiffs decided that the Executive Committee would meet and determine whether or not to recommend the settlements to the other Limited Partners. In mid-December, 1988 (it is not clear from the record precisely when), the Executive Committee met, and determined that it would recommend rejection of the settlements. A majority of the plaintiffs followed this recommendation, and on January 9, 1989 Tiernan, a member of the Executive Committee, sent Bloom a letter informing him of the Limited Partners Committee's rejection of the settlements. On January 13, 1989, Bloom wrote the district court informing it of this decision.
 
 
 17
 Attorneys for all parties were present at the June 1, 1989 conference. We have already noted plaintiffs' contentions. The lawyers for the Attorney Defendants argued that although Bloom did not have express authority to settle his clients' claims, the settlements were binding because he had held himself out as possessing such authority, citing Rothman v. Fillette, 503 Pa. 259, 469 A.2d 543 (1983), and Manzitti v. Amsler, 379 Pa.Super. 454, 550 A.2d 537 (1988), affd., 524 Pa. 587, 574 A.2d 601 (1990). They advised the district court that they were prepared to offer into evidence correspondence indicating that the test supposedly established by Rothman and Manzitti had been met.
 
 
 18
 During the colloquy, the district court questioned Sharp's assertion that his clients had been unaware of Bloom's conduct, pointing to the October 11 letter from Bloom to the attorney for the Soja Defendants, which was copied to the members of the Executive Committee and which stated "[t]his letter will confirm that the Plaintiffs[ ] have agreed to settle their claims ... with the Soja defendants." The district court stated that in its view, the letter unambiguously informed the Executive Committee that Bloom was not merely engaging in settlement negotiations, but was actually reaching agreement. Sharp responded that the Executive Committee's actual understanding was that this was merely an offer. He cited Bloom's September 9, 1988 memorandum to the Executive Committee, which accompanied the Attorney Defendants' September 7, 1988 letter unambiguously accepting an offer, but characterized that letter as merely an offer. Sharp contended that his witnesses would establish that the Executive Committee never met after receiving this letter and therefore could not have accepted any offer. Furthermore, even if the Executive Committee had explicitly attempted to settle the case, it would have been void because the Agreement did not give the Executive Committee authority to compromise the claims of the other Limited Partners. Finally, Sharp maintained that the plaintiffs had repudiated Bloom's actions within a reasonable time of learning of them.
 
 
 19
 The Attorney Defendants and the Accountant Defendants relied on the exchange of letters to establish that a settlement with sufficiently definite terms had been reached. Counsel for the Soja Defendants pointed out that whatever the disposition of the claims of the other defendants, the unequivocally clear statement of the October 11, 1988 letter was that the settlement with respect to them was valid. In rebuttal, Sharp said that the parties were never in agreement on individual plaintiffs' ability to opt out of the settlements.
 
 
 20
 At this point, the district court granted the motion to enforce the settlements with respect to the Soja defendants, the Accountant Defendants, and the Attorney Defendants. He explained that "my ruling is based primarily on the exchange of correspondence which I think is clear and unambiguous." Sharp asked the court if he could make an offer of proof of the proposed testimony of two members of the Executive Committee. After a brief conference among the attorneys, counsel for the Attorney Defendants, we presume speaking for all of the defendants, stipulated that "the argument which was made by counsel for plaintiffs may be deemed, if the Court so chooses, as an offer of proof.... Not that it is true or admissible or relevant, but simply as an offer of proof." The parties also agreed to the admission of the Limited Partners Committee Agreement and of those portions of the correspondence detailed above that had not already been admitted into the record.[4]
 
 II.
 
 21
 As a preliminary matter we must establish whether we have appellate jurisdiction. This is an appeal from the district court's enforcement of settlement agreements purportedly entered into between plaintiffs and three out of four groups of defendants. Before this appeal was filed the claims against the remaining defendant group, the Devoe Defendants, were dismissed; but this dismissal was, for some of the plaintiffs, without prejudice. Some plaintiffs retained the ability to reinstitute part of this litigation. Thus, at the time this appeal was filed, jurisdiction under 28 U.S.C. Sec. 1291 was lacking.
 
 
 22
 That defect has since been cured. Several months after this appeal was filed, plaintiffs renounced, through letter briefs, any intention to take further action against the Devoe Defendants. Therefore, we now have jurisdiction over this appeal. See Ingersoll-Rand Fin. Corp. v. Callison, 844 F.2d 133, 135 n. 1 (3d Cir.1988); Fassett v. Delta Kappa Epsilon (New York), 807 F.2d 1150, 1156-57 (3d Cir.1986), cert. denied, 481 U.S. 1070, 107 S.Ct. 2463, 95 L.Ed.2d 872 (1987).
 
 III.
 
 23
 Plaintiffs contend that a hearing was required. "When relief from a judgment hinges upon a factual issue and credibility determinations are involved, a hearing should be held to determine entitlement to relief." Garabedian v. Allstates Eng'g Co., 811 F.2d 802, 803 (3d Cir.1987) (vacating an order enforcing an allegedly invalid settlement and remanding for a hearing); see also Callie v. Near, 829 F.2d 888, 890 (9th Cir.1987) ("Where material facts concerning the existence or terms of an agreement to settle are in dispute, the parties must be allowed an evidentiary hearing.") (emphasis in original); Mid-South Towing Co. v. Har-Win, Inc., 733 F.2d 386, 390 (5th Cir.1984). On the other hand, no hearing is necessary where there is no dispute as to the existence of a settlement. Petty v. Timken Corp., 849 F.2d 130, 132 (4th Cir.1988) (finding summary enforcement appropriate).
 
 
 24
 This central issue--whether there was any disputed issue of material fact as to the validity of the settlement agreements--is similar to that which any court must address when ruling on a motion for summary judgment. See Fed.R.Civ.P. 56(c). This is not mere coincidence. The stakes in summary enforcement of a settlement agreement and summary judgment on the merits of a claim are roughly the same--both deprive a party of his right to be heard in the litigation. See Autera v. Robinson, 419 F.2d 1197 (D.C.Cir.1969) (describing consequences of summary enforcement of a settlement, and finding a hearing necessary).[5]
 
 
 25
 When reviewing a summary judgment motion, we must treat all the non-movant's assertions as true, and "when these assertions conflict with those of the movant, the former must receive the benefit of the doubt." Goodman v. Mead Johnson & Co., 534 F.2d 566, 573 (3d Cir.1976), cert. denied, 429 U.S. 1038, 97 S.Ct. 732, 732, 50 L.Ed.2d 748 (1977). Summary judgment is appropriate only if "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Our review of the district court's application of this standard is plenary. E.g., Erie Telecommunications, Inc. v. City of Erie, 853 F.2d 1084, 1093 (1988).
 
 
 26
 Because this situation so closely resembles a grant of summary judgment, we will apply a similar standard of review. Cf. Wong v. Bailey, 752 F.2d 619 (11th Cir.1985) (reviewing district court's order granting a "motion for summary judgment or motion to enforce settlement" as it would a grant of a motion for summary judgment). We will treat plaintiffs' assertions as true, and will affirm the district court only if defendants are entitled to enforcement of the agreements as a matter of law.
 
 IV.
 
 27
 Before deciding whether summary enforcement was appropriate, we must determine what substantive law to apply. If the district court's jurisdiction were founded on the parties' diversity of citizenship, and we were addressing the settlement of state law claims, there would be no question but that "[state] law provides the rule of decision on the question of an attorney's authority to settle his client's action." Edwards v. Born, Inc., 792 F.2d 387, 389 (3d Cir.1986). There we applied Virgin Islands territorial law to determine the scope of an attorney's authority to settle litigation. We reached that result because "[f]ederal courts are able to create federal common law only in those areas where Congress or the Constitution has given the courts authority to develop substantive law, as in labor and admiralty, or where strong federal interests are involved, as in cases concerning the rights and obligations of the United States." General Eng'g v. Martin Marietta Alumina, 783 F.2d 352, 356 (3d Cir.1986); see Rules of Decision Act, 28 U.S.C. Sec. 1652 (1988) ("The laws of the several states, except where the Constitution or treaties of the United States or Acts of Congress otherwise require or provide, shall be regarded as rules of decision in civil actions in the courts of the United States, in cases where they apply."); Boyle v. United Technologies Corp., 487 U.S. 500, 108 S.Ct. 2510, 101 L.Ed.2d 442 (1988) (applying federal common law where necessary to protect a "uniquely federal interest"); Miree v. DeKalb County, 433 U.S. 25, 97 S.Ct. 2490, 53 L.Ed.2d 557 (1977) (refusing to apply federal common law where no federal interests were affected); Morgan v. South Bend Community School Corp, 797 F.2d 471, 474-75 (7th Cir.1986) ("When the federal government is not a party to the litigation, neutral state rules that do not undermine federal interests should be applied unless some statute (or the Constitution) authorizes the federal court to create a rule of federal law.").
 
 
 28
 The question, then, is whether that result changes when some of the claims in the lawsuit involve rights derived from federal law. We have not directly addressed this question in the context of combined federal and state law claims. In Edwards, for example, we did not address what law applied when the action did, in part, "implicate rights and duties derived from federal law." 792 F.2d at 389.
 
 
 29
 We believe that the presence of both federal and state claims in this lawsuit does not change our choice of law result. It would be illogical to consider the viability of the settlement agreements as to different claims under different standards. If, for example, apparent authority sufficed to establish a settlement under federal but not state law, a settlement could be valid with respect to federal but not with respect to state claims. This would eviscerate any agreement in which the litigants sought settlement of all their claims. Some consistent rule, then, is needed. Because our focus is on an attorney's relationship with his clients, no substantial federal interest is affected here, and we opt for state law. General Eng'g Corp., 783 F.2d at 356.[6]
 
 
 30
 Our next step is determining which state's law to apply. We look to Pennsylvania's choice of law rules, Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941), which provide that the applicable law is that of the place with the most significant relationship to the parties and the transaction. See, e.g., Myers v. Commercial Union Assurance Cos., 506 Pa. 492, 496, 485 A.2d 1113, 1116 (1984); Griffith v. United Air Lines, 416 Pa. 1, 203 A.2d 796 (1964). Under this analysis, Pennsylvania law controls. This lawsuit arose from the collapse of a building project in Philadelphia. Pennsylvania is the forum state and most of the negotiations leading up to the alleged settlements took place among attorneys located in Pennsylvania.
 
 V.
 
 31
 We now turn to applying Pennsylvania law. We must predict what the Pennsylvania Supreme Court would decide on these issues. Commissioner of Internal Revenue v. Bosch, 387 U.S. 456, 87 S.Ct. 1776, 18 L.Ed.2d 886 (1967); Gruber v. Owens-Illinois, Inc., 899 F.2d 1366 (3d Cir.1990).
 
 A.
 
 32
 When the Pennsylvania Supreme Court last addressed the issue of an attorney's authority to settle his client's claims, it stated: "At the outset, it must be understood that under the facts of this case there is no question of an implied or an apparent agency. The law in [Pennsylvania] is quite clear that an attorney must have express authority to settle a cause of action for the client." Rothman v. Fillette, 503 Pa. 259, 264, 469 A.2d 543, 545 (1983) (citing Local No. 2, Int'l Org. of Masters v. International Org. of Masters, 456 Pa. 436, 318 A.2d 918 (1974); Senyshyn v. Karlak, 450 Pa. 535, 299 A.2d 294 (1973); McLaughlin v. Monaghan, 290 Pa. 74, 138 A. 79 (1927); Lipschutz v. Lipschutz, 124 Pa.Super. 380, 188 A. 556 (1936)). Express authority empowers an attorney to settle a client's claim; it does not arise merely from the fact of representation, but must be the result of explicit instructions regarding settlement. E.g., Senyshyn, 450 Pa. at 540, 299 A.2d at 297 (quoting Starling v. West Erie Ave. Bldg. and Loan Ass'n, 333 Pa. 124, 126, 3 A.2d 387, 388 (1939)).
 
 
 33
 In Rothman, the Pennsylvania Supreme Court limited its inquiry to a search for express actual authority because "under the facts of this case there [was] no question of an implied or apparent agency." 503 Pa. at 264, 469 A.2d at 543. This suggests that the Court was reluctant to rule out completely the availability of the latter two sources of authority in Pennsylvania. Implied actual authority is the result of a principal's [the client's] conduct toward his agent [the attorney]. It has as its source "written or spoken words or other conduct of the principal [the client] which, reasonably interpreted, causes the agent [the attorney] to believe that the principal desires him so to act on the principal's account." Restatement (Second) of Agency Sec. 26 (1958). Apparent authority, on the other hand, has as its source the client's conduct toward another party in the litigation. It arises from a principal's manifestations to a third party that an agent has authority to act on the principal's behalf. See Restatement (Second) of Agency Sec. 8 (1958).
 
 
 34
 To understand the significance of the Pennsylvania Supreme Court's reservation in Rothman, it is necessary to canvas some older authority. In Township of North Whitehall v. Keller, 100 Pa. 105, 108 (1882), the Pennsylvania Supreme Court stated, in dicta, that an attorney could have implied actual authority to settle a claim resulting "from the character of the claim requiring collection and the circumstances connected with it." In that case, the Court found such authority lacking. See also Brockley v. Brockley, 122 Pa. 1, 7, 15 A. 646, 647 (1888) ("There may be cases, perhaps, where the claim is seriously imperiled by delay, with no opportunity for consultation, when, from the character of the claim or the circumstances attending it, the power to compromise may be implied.") (citing Keller); cf. Tucker v. Tucker, 370 Pa. 8, 19-20, 87 A.2d 650, 656 (1952). In Tucker, plaintiffs' attorney had been authorized to arrange for the sale of plaintiffs' interest in a partnership. The attorney established an effective date for the transfer thereby cutting off plaintiffs' interest in partnership profits arising after that date. The Court acknowledged the general rule that an attorney cannot, without special authority, compromise any substantial right of his client, but stated that the sale agreement was "well within the implied authority of plaintiffs' attorney as being merely the arrangement of a detail incident to [the sale]." Id.
 
 
 35
 We need not look back quite so far for an endorsement of apparent authority in Pennsylvania. In Sustrik v. Jones & Laughlin Steel Corp., 189 Pa.Super. 47, 50, 149 A.2d 498, 500 (1959), the Pennsylvania Superior Court relied on the Restatement of Agency Sec. 159 comment b (1933), which provides that a principal can be bound to unauthorized acts of his agent where "the principal may fairly be charged with responsibility for the third person's misapprehension as to the agent's authority." In that case, plaintiffs attempted to escape the effect of a settlement agreement entered into by their attorneys. During the course of settlement negotiations, defense counsel had repeatedly observed plaintiffs conferring with their attorney. The court held that the plaintiffs' conduct "clothed their counsel with authority to settle the case upon principles of apparent authority akin to those above referred to." 189 Pa.Super. at 52-53, 149 A.2d at 501.
 
 
 36
 We acknowledge that this area is clouded somewhat by the fact that the Pennsylvania Supreme Court has on occasion stated without qualification that "[a]n attorney cannot, absent express authority, settle litigation." International Org. of Masters, 456 Pa. at 441, 318 A.2d at 921 (1974); see also, e.g., Roos v. Fairy Silk Mills, 334 Pa. 305, 312-13, 5 A.2d 569, 573 (1939) (stating that an attorney cannot release a client's lien without express consent). But such unqualified statements of the rule are the exception in the caselaw. More typical is Starling, which Roos and International Organization of Masters relied on.[7] In Starling, the Pennsylvania Supreme Court stated that express authority was necessary, but specifically noted the absence of implied actual or apparent authority in that case, see Starling, 333 Pa. at 126-27, 3 A.2d at 388, thereby suggesting that such authority might suffice. Moreover, in International Organization of Masters and Roos, the statements requiring express authority were dicta. Our research has uncovered no case holding that nothing other than express authority will vest an attorney with authority to settle a client's claims. While the Court's endorsement of implied actual authority in Keller was also dicta, it was an unequivocal statement of the rule. The Pennsylvania Superior Court's endorsement of apparent authority in Sustrik was an element of its holding; so we are similarly reluctant to find that case overruled by dicta in later Pennsylvania Supreme Court opinions. When viewed in light of the Pennsylvania Supreme Court's reservation of the availability of implied actual and apparent authority in Rothman, we hesitate to find that those sources of authority would not be available in the appropriate case.
 
 
 37
 We also acknowledge that the Pennsylvania Supreme Court has frequently stated that the requirement of some particular source of authority denies the existence of implied actual or apparent authority solely by virtue of the fact of representation. See, e.g., Senyshyn, 450 Pa. at 540, 299 A.2d at 297; Starling, 333 Pa. at 126-27, 3 A.2d at 388. Those cases, though, are not inconsistent with the notion that in certain cases, additional facts that fall short of explicit instructions might provide a sufficient source of authority.
 
 
 38
 Therefore, we believe that the Pennsylvania Supreme Court might allow implied actual or apparent authority to suffice. We do not believe, however, that either ground is so clearly available in this case to justify summary enforcement of the settlement agreements. Furthermore, we emphasize the general rule that an attorney cannot settle his client's case without express actual authority.
 
 
 39
 Defendants purport to find a separate source of authority in Rothman v. Fillette, 503 Pa. 259, 469 A.2d 543 (1983) and a recent Pennsylvania Superior Court case applying Rothman, Manzitti v. Amsler, 379 Pa.Super. 454, 550 A.2d 537 (1988), affd. without opinion, 524 Pa. 587, 574 A.2d 601 (1990). According to defendants, those cases have broadened an attorney's authority to settle a client's cause of action substantially beyond the traditional grounds of authority we have discussed. We do not read Rothman and Manzitti that way.
 
 
 40
 In Rothman, plaintiff, who had been injured in an automobile accident, retained an attorney to pursue his claim. Unknown to plaintiff, his attorney negotiated a settlement, received a settlement check, forged plaintiff's signature on it, and absconded with the money. When plaintiff later sought to pursue his action, defendants asserted that plaintiff was foreclosed by the earlier settlement. The Pennsylvania Supreme Court held that notwithstanding the attorney's conceded lack of authority, the settlement still barred pursuit of his action. The Court stated, "where one of two innocent persons must suffer because of the fraud of a third, the one who has accredited him [the client who has retained the attorney] must bear the loss." 503 Pa. at 265, 469 A.2d at 345. Therefore, in cases where there is fraud, and where the defrauded party bears a loss, no express authority is necessary. In this case, there is no allegation that plaintiffs' attorney defrauded the defendants; and there is no tenable claim for loss.[8]
 
 
 41
 Defendants suggest that in Rothman, the Court abandoned any requirement that an attorney have authority to settle a client's case. But in Rothman, the Court expressly reaffirmed that longstanding requirement. "At the outset, it must be understood that under that facts of this case there is no question of an implied or apparent agency. The law in this jurisdiction is quite clear that an attorney must have express authority to settle a cause of action of the client." Rothman, 503 Pa. at 264, 469 A.2d at 545. Defendants' contention amounts to an assertion that the Pennsylvania Supreme Court was silently abandoning that longstanding requirement in the same case in which it reaffirmed it.
 
 
 42
 In Manzitti, the Pennsylvania Supreme Court affirmed, without opinion, the Superior Court's enforcement of a settlement entered into without authority. That case arose from an operation negligently performed on Thomas Manzitti. He filed a claim for his injuries and his wife, Patricia Manzitti, filed jointly a derivative claim for loss of her husband's consortium. Their attorney was expressly authorized to settle Thomas Manzitti's claims, but, the Superior Court assumed, was not authorized to settle his wife's claim. After plaintiffs' attorney entered into a settlement agreement on behalf of both Thomas and Patricia Manzitti, the Manzittis attempted to repudiate the settlement. The court found them both bound to the terms of the settlement agreement. The court held that Patricia Manzitti's loss of consortium claim survived her husband's settlement of the underlying claim, but was barred by the settlement agreement that her attorney had entered into on her behalf. Citing Rothman, the court held that Patricia Manzitti had to bear the result of her attorney's unauthorized conduct. Manzitti, 379 Pa.Super. at 469, 550 A.2d at 544.
 
 
 43
 Unlike our case, in Manzitti, there was express actual authority to settle Thomas Manzitti's underlying claim. The Superior Court merely extended this authority to Patricia Manzitti's loss of consortium claim, which was linked to the underlying claim. In Pennsylvania, an action for loss of consortium is derivative of the injured party's claim. See, e.g., Linebaugh v. Lehr, 351 Pa.Super. 135, 505 A.2d 303 (1986). Thus, an injured party's negligence will bar her spouse's claim. E.g., Riesberg v. Pittsburgh & Lake Erie R.R., 407 Pa. 434, 443, 180 A.2d 575, 580 (1962). Furthermore, a loss of consortium claim must be brought in the same action as the spouse's original injury claim. Pennsylvania Rules of Civil Procedure Sec. 2228 (1987); Hopkins v. Blanco, 224 Pa.Super. 116, 121-23, 302 A.2d 855, 858-59 (1973), affd., 457 Pa. 90, 320 A.2d 139 (1974). In other ways the loss of consortium claim, which can survive settlement of the underlying personal injury claim, has an identity distinct from the underlying claim. This was an element of the Superior Court's ruling in Manzitti. But there is a relationship between the two claims that is wholly lacking in most other cases.
 
 
 44
 Thus Manzitti is similar to Tucker v. Tucker, 87 A.2d 650, 656, 370 Pa. 8, 19-20 (1952), in which the Supreme Court found implied actual authority to resolve a matter incident to an issue to which express authority had been given. Manzitti fits within existing doctrine and does not expand the traditional grounds of authority. It is inapposite where, as here, under plaintiff's view of the facts, there is no express authority to settle any claim; and no unsettled claim is derivative of any settled claim.
 
 
 45
 In Manzitti, the Superior Court stated that the case was governed by the Supreme Court's statement in Rothman that "where one of two innocent persons must suffer, the loss should be borne by him who put the wrongdoer in a position of trust and confidence." Manzitti, 379 Pa.Super. at 469, 550 A.2d at 544 (quoting Rothman, 503 Pa. at 265, 469 A.2d at 545). Thus, defendants argue, the Superior Court read Rothman as vitiating the need for any inquiry into an attorney's authority. As we have noted, however, we must predict what the Pennsylvania Supreme Court would decide, and when it last addressed the issue, in Rothman, it restated the need for some source of authority. Having declined to abandon the rule in Rothman, it cannot have worked just such an abandonment through its summary affirmance in Manzitti. If the settlement agreements in this case are valid, they must be founded on one of the traditional grounds of authority.
 
 B.
 
 46
 We turn now to applying the law to the facts before us. Generally, the traditional sources of authority are express actual authority, implied actual authority and apparent authority.[9] Summary enforcement was proper if any ground indisputably provides a basis for Bloom's authority, so that even taking plaintiffs' assertions as true, the settlements are valid. If, however, plaintiffs have raised a material dispute, summary enforcement was improper.
 
 
 47
 According to Sharp, plaintiffs never gave their attorney express actual authority to settle this case. At the June 1, 1989 settlement conference before the district court, Sharp offered the testimony of a member of the Executive Committee who would testify that Bloom was authorized by the plaintiffs only to participate in settlement discussions, not to reach agreement. Furthermore, the Executive Committee was never given authority to settle the claims of any of the other plaintiffs. Accepting these assertions as true, defendants are not entitled to summary enforcement of the settlements on this ground.
 
 
 48
 Nor does implied actual authority suffice. Even if such authority is available in Pennsylvania, according to Sharp, the members of the Executive Committee would testify that the limits on Bloom's authority were clear and that Bloom had no significant dealings with any plaintiffs other than members of the Executive Committee. Accepting this as true, implied actual authority also is not so clearly available as to justify summary enforcement of the settlements. If the Executive Committee could not have provided express authority to Bloom, there is at least a disputed issue of fact whether it could have provided implied actual authority.
 
 
 49
 Finally, apparent authority is also unavailable. Even if such authority is available in Pennsylvania, the record contains no mention of any significant contact between the plaintiffs and the defendants or their attorneys. Here, also, there is at least a disputed question of fact as to whether apparent authority was a valid source of authority in this case.
 
 C.
 
 50
 Even if plaintiffs' attorney lacked authority, the settlements might nonetheless be so indisputably valid to justify summary enforcement if plaintiffs had ratified the settlements. "A client ratifies his attorney's act if he does not repudiate it promptly upon receiving knowledge that the attorney has exceeded his authority." Yarnall v. Yorkshire Worsted Mills, 370 Pa. 93, 96, 87 A.2d 192, 193 (1952) (finding a client bound to a settlement that he had learned of 20 months prior to repudiation); Restatement (Second) of Agency Sec. 94 (1958) ("An affirmance of an unauthorized transaction can be inferred from a failure to repudiate it.").
 
 
 51
 According to Sharp's statements before the district court at the June 1 conference, plaintiffs first learned of the terms of the alleged settlements from the October 25 letter from Bloom. Even then, the Limited Partners treated the agreements as proposals, not as accepted settlements. It is not clear from the record when, if ever, plaintiffs' duty to repudiate their attorney's actions was activated. Therefore, by Sharp's version, plaintiffs have not ratified their attorney's actions by a failure to repudiate.
 
 
 52
 Even if a duty to repudiate was triggered on receipt of the October 25 mailing, there is a disputed issue of fact whether the partners' response was unreasonably slow. On December 2, Bloom informed the district court by letter with copies to defendants' attorneys, that one of the limited partners had raised questions concerning the settlements, and that the limited partners would be meeting on December 9 to resolve those questions. Furthermore, a final decision to reject the settlements was communicated to Bloom on January 9, 1989, and to the defendants, by copies of the January 13, 1989 letter to the district court. We also note the large number of plaintiffs and the fact that they were spread throughout the country.
 
 
 53
 The four plaintiffs who were members of the Executive Committee were copied on several pieces of correspondence that clearly evidenced agreement on settlement. For example, on September 9, 1988 they were mailed copies of a letter in which the Attorney Defendants "accept[ed] plaintiffs' offer of settlement...." Given the size of the Executive Committee, and the clarity of the notice, this delay might have so clearly constituted ratification as to justify summary enforcement of the settlements. But according to plaintiffs, the Executive Committee never had authority to settle the case. And if the Executive Committee did not have authority to settle the other plaintiffs' cases, there is at least a disputed question of fact whether the Executive Committee's silence could have ratified the settlement of the other plaintiffs' cases.
 
 
 54
 Of course we express no opinion on the ultimate success of this argument. Under plaintiff's version of the events, however, there was no ratification. Therefore summary enforcement of the settlement agreements on these grounds was unavailable.[10]
 
 D.
 
 55
 Finally, the Accountant Defendants contend that plaintiffs are equitably estopped from challenging the validity of the settlement agreements. See generally Novelty Knitting Mills, Inc. v. Siskind, 500 Pa. 432, 457 A.2d 502 (1983). "The two essential elements of equitable estoppel are inducement and justifiable reliance on that inducement.... [T]he acts that are induced may be by commission or forbearance provided that a change in condition results causing disadvantage to the one induced." 500 Pa. at 436, 457 A.2d at 503-04. The Accountant Defendants claim that they are harmed because they have represented to insurance companies that the claims were settled, and if their settlement is voided they will probably be denied coverage. These defendants, however, appear to be in no worse position than they would be absent settlement. Therefore, there is at least a disputed question of fact as to whether estoppel was available in this case.
 
 VI.
 
 56
 Defendants have offered several possible sources for the plaintiffs' attorney's authority. Because plaintiffs have raised substantial, material disputes as to the availability of each of these grounds, none of them indisputably justifies enforcement of the settlement agreements at this stage of the proceedings. Therefore, the district court's summary enforcement of the settlement agreements was inappropriate and we will vacate the order. See Autera v. Robinson, 419 F.2d 1197, 1198 (D.C.Cir.1969) (reversing an order enforcing a disputed settlement agreement without a hearing).
 
 
 57
 Given this disposition, we need not address plaintiffs' contention that there was no meeting of the minds on essential terms of the settlement agreements.
 
 
 58
 We will vacate the order and remand for proceedings consistent with this opinion. Each party to bear its own costs.
 
 
 
 *
 The Honorable William L. Standish, United States District Judge for the Western District of Pennsylvania, setting by designation
 
 
 [1]
 The record does not reveal whether this offer was oral or written
 
 
 [2]
 At the June 1, 1989 conference before the district court, Sharp stated that the letter was forwarded to the Executive Committee. The cover memorandum itself, however, is addressed to both the Executive Committee and the Limited Partners. For the purposes of this appeal, we accept Sharp's characterization of the letter's distribution
 
 
 [3]
 The one exception to this statement is the exclusion of Donald Metzger, who is named in the Agreement as a member of the Executive Committee, from the list of copied parties in Bloom's September 7, 1988 letter to the district court
 
 
 [4]
 It is not clear that the September 7, 1988 letter from Bloom to the district court was officially entered into the record. Three of the four defendant groups were copied on this letter
 
 
 [5]
 If we had before us explicit findings by the district court, we would review them under a clearly erroneous standard. Even without explicit findings, we could find that the district court has impliedly made a finding that there is no material dispute as to the existence of a settlement. At least one other Court of Appeals has done this in reviewing enforcement of a settlement agreement. See Borne v. A & P Boat Rentals No. 4, Inc., 780 F.2d 1254, 1258 (5th Cir.1986) (per curiam) ("Based on the evidence in the record, the district court's implied finding that [settling plaintiff] was informed of his rights and of the consequences of agreeing to settle is not clearly erroneous."). As is apparent from the discussion below, however, there are several possible routes to validity of the settlement, any one of which will suffice. In this situation, rather than fabricate a host of possible alternative implied findings, we find it simpler to adopt the summary judgment analogy. We note that our result would not differ under the implied findings approach
 
 
 [6]
 We need not decide what rule would apply if we were dealing only with federal claims. We note, however, that we have addressed this issue under federal maritime law, and found that state law applies. See Complaint of Bankers Trust Co., 752 F.2d 874 (3d Cir.1984). Bankers Trust involved a challenge to an allegedly unauthorized release of plaintiff's federal maritime wrongful death claims. Plaintiff's claims were allegedly barred by a release executed, in exchange for a $29,000 settlement, by an attorney possessing a fraudulent power of attorney authorizing him to act on plaintiff's behalf. We stated that "even though federal law governs the cause of action, state law, including state conflicts law, applies" to the issue of the extent of plaintiff's attorney's authority. 752 F.2d at 881 n. 9. This is consistent with the ruling of the Seventh Circuit in Morgan v. South Bend Community School Corp., 797 F.2d 471 (7th Cir.1986). But see Fennell v. TLB Kent Co., 865 F.2d 498, 501 (2d Cir.1989) (Federal law provides the relevant rules for deciding an attorney's authority to settle his client's federal civil rights case.); Mid-South Towing Co. v. Har-Win, Inc., 733 F.2d 386 (5th Cir.1984) (In a maritime case, federal law determines the scope of an attorney's authority to settle a lawsuit.)
 
 
 [7]
 International Organization of Masters cites Senyshyn v. Karlak; the cited passage in Karlak is a lengthy quote of Starling
 
 
 [8]
 The Accountant Defendants are the only defendants that specifically allege any loss. They make that claim in connection with an equitable estoppel argument, which is discussed below
 
 
 [9]
 An agent may also derive certain powers "not from authority, apparent authority, or estoppel but solely from the agency relation...." Restatement (Second) of Agency Sec. 8A (1957). Under the Restatement's approach, this inherent agency power is not construed as constituting actual authority, but stands in its stead to bind the principal to acts of his agent. Id. at comment a. In some Pennsylvania decisions, these inherent powers have been treated as a form of implied actual authority. See Rednor & Kline, Inc. v. Department of Highways, 413 Pa. 119, 125, 196 A.2d 355, 358 (1964). Because an attorney does not have authority to settle a claim solely by virtue of the fact of representation, see Senyshyn, 450 Pa. at 540, 299 A.2d at 297, this doctrine is not applicable in this case
 
 
 [10]
 Under a line of authority closely related to ratification, a client can ratify his attorney's actions by accepting benefits flowing from a settlement. E.g., Greentree Cinemas, Inc. v. Hakim, 289 Pa.Super. 39, 432 A.2d 1039 (1981). Plaintiffs did avoid foreclosure because a settlement with defendants seemed near. But that was the result of the prospect of settlement, not of the settlement itself