**TEDESCO MANUFACTURING COMPANY, INC.,**
Appellant

v.

**HONEYWELL INTERNATIONAL INC.**

No. 08–4635.

United States Court of Appeals, Third Circuit.

Submitted Under Third Circuit LAR 34.1(a) Feb. 4, 2010.

Filed March 17, 2010.

Douglas M. Hottle, Esq., Chad I. Michaelson, Esq., Russell J. Ober, Jr., Esq., Meyer, Unkovic & Scott, Pittsburgh, PA, for Appellant.

Thomas M. Hanson, Esq., Andrew J. McGuinness, Esq., Dykema, Ann Arbor, MI, Melissa F. Miller, Esq., Pepper Hamilton, Pittsburgh, PA, A. Michael Pratt, Esq., Pepper Hamilton, Philadelphia, PA, for Honeywell International Inc.

Before: McKEE, HARDIMAN, Circuit Judges, and RUFE *, District Judge.

## OPINION OF THE COURT

HARDIMAN, Circuit Judge.

Tedesco Manufacturing, Inc. appeals a final judgment of the District Court denying its third motion to enforce settlement agreement. For the reasons that follow, we will affirm in part, vacate in part, and remand the case.

### I.

This case comes to us for the second time. Because we write for the parties, we assume familiarity with the factual background set forth in our previous opinion. *See Tedesco Mfg. Co. v. Honeywell Int'l Inc.*, 127 Fed.Appx. 50 (3d Cir.2005). In that appeal, we interpreted Paragraph 13 of the agreement in principle (AIP) and held that it authorized Honeywell to offset amounts owed by Tedesco against the sums Honeywell agreed to pay.

On remand, at the insistence of the District Court, the parties executed a written "Settlement Agreement and Mutual Re-lease" (Settlement Agreement) that resolved many, but not all, of the disputed issues. The parties memorialized their remaining disagreements in Paragraph 11 and those issues were excluded from the Settlement Agreement's mutual general release.

Paragraph 11 is not a model of clarity, however, particularly when it is analyzed in conjunction with other provisions of the Settlement Agreement. For example, the initial section of Paragraph 5 provides that "Honeywell shall purchase and Tedesco shall transfer to Honeywell or its designee that portion of Tedesco's finished goods and raw materials inventory that Honeywell finds usable in its discretion based on national sales (the "Inventory") at full transfer price ... for finished goods and at cost for raw materials." *Id.* at 412A. Meanwhile, Paragraph 5(a) states that "the Inventory, and the price that Honeywell will pay for the Inventory, is set forth on Attachments A (raw materials) and B (finished goods) hereto...."[1] As we shall explain, the goods and prices listed in Attachments A and B cannot easily be reconciled with the introductory provisions of Paragraph 5. Moreover, a number of the disputes reserved in Paragraph 11 of the Settlement Agreement relate to these apparent internal contradictions of Paragraph 5.

In spite of the rather unsettled aspects of the Settlement Agreement, in the summer of 2006 Tedesco transferred, and Honeywell paid for, that portion of Tedesco's inventory that Honeywell deemed usable. Unsurprisingly, the parties continued to disagree as to whether Honeywell had properly evaluated the usability of the in-

---

* The Honorable Cynthia M. Rufe, District Judge for the United States District Court for the Eastern District of Pennsylvania, sitting by designation.

1. Paragraph 5(a) states that Attachments A and B are "preliminary" in nature, but also provides that "in no event shall Honeywell be required to pay for" anything not listed in Attachment A or B. *Id.*

ventory, whether Honeywell was paying the proper price for these goods, and which of them was responsible for the packing and loading costs associated with shipping the goods. Because of these disputes, Tedesco filed a third motion to enforce settlement.[2] In response to that motion, the District Court ordered the parties to mediate issues on which it found questions of fact remained.[3] As for issues that it found to present questions of law, the District Court ruled against Tedesco on its claims that Honeywell:

(1) improperly based its usability determination on its current product line, rather than on "national sales" as required by both the AIP and the Settlement Agreement;

(2) improperly discounted the purchase price for Tedesco's inventory and raw materials to reflect Honeywell's estimate that not all of the goods would be usable;

(3) wrongly refused to include in the "full transfer price" a series of rebates it had promised Tedesco in a pre-litigation contract;

(4) wrongly refused to repurchase any used brake shoe cores;

(5) should be required to pay packing and loading costs for the inventory and raw materials it had purchased from Tedesco; and

(6) began operations in Tedesco's exclusive territory before making the agreed-upon payment to buy out Tedesco's rights, which entitled Tedesco to disgorgement of Honeywell's profits from these operations.

The District Court concluded that the second and sixth claims had been released by Tedesco pursuant to the Settlement Agreement. As to the other four issues,

the District Court ruled for Honeywell on the merits. Tedesco appeals the judgment of the District Court as to all six issues.

## II.

The gravamen of Tedesco's appeal is that the District Court erred when it ruled in Honeywell's favor as a matter of law, when a hearing was necessary to determine disputed factual issues. "Where material facts concerning the *existence or terms* of an agreement to settle are in dispute, the parties must be allowed an evidentiary hearing." *Saudi Basic Inds. v. Exxon Corp.*, 364 F.3d 106, 113 (3d Cir.2004) (citations omitted).

"Settlement agreements 'are regarded as contracts and must be considered pursuant to general rules of contract interpretation.'" *Miller v. Ginsberg*, 874 A.2d 93, 99 (Pa.Super.2005) (quoting *Friia v. Friia*, 780 A.2d 664, 668 (Pa.Super.2001)). In interpreting a written contract,

[f]irst, the court must make a preliminary inquiry as to whether the contract before it is ambiguous. This question is an issue of law for the court to resolve. A term is ambiguous if it is susceptible to reasonable alternative interpretations. If the court determines that a given term in a contract is ambiguous, then the interpretation of that term is a question of fact for the trier of fact to resolve in light of the extrinsic evidence offered by the parties in support of their respective interpretations.

*Sanford Inv. Co. v. Ahlstrom Machinery Holdings, Inc.*, 198 F.3d 415, 421 (3d Cir. 1999) (citations omitted).

Because the District Court adjudicated Tedesco's claims without holding an evidentiary hearing, it follows that the Dis-

---

2. Tedesco's second motion to enforce settlement agreement was filed on July 17, 2006, and withdrawn a week later.

3. The mediation was successful, and these issues are not before us.

trict Court found no material facts in dispute. We review this determination *de novo*. *Tiernan v. Devoe*, 923 F.2d 1024, 1031–32 & n. 5 (3d Cir.1991) (likening a motion to enforce settlement agreement to a motion for summary judgment, and applying the same standard).

## III.

### A.

■ We first consider Tedesco's claim that material issues of fact existed regarding Honeywell's usability determination. The District Court rejected Tedesco's claim based on Paragraph 5 of the Settlement Agreement, which granted to Honeywell the power to determine usability "in its discretion."

Paragraph 5 provides that "Honeywell shall purchase ... that portion of Tedesco's finished goods and raw materials inventory that Honeywell finds usable in its discretion based on national sales." App. 421A. Unlike Paragraph 5, Attachment A of the Settlement Agreement—which deals with "raw inventory"—states that usability was "determined based on bill of materials compliance with current HW product line." *Id.* at 428A. And unlike both Paragraph 5 and Attachment A, Attachment B—which deals with "finished goods"—states that usability was "determined based on previous 6–month sales and bill of materials compliance." *Id.* at 481A. As noted above, Paragraph 5(a) of the Settlement Agreement provides that the Attachments represent those goods that Honeywell found usable, and thus was obliged to purchase. *Id.* at 421A. Finally, Paragraph 11(f) of the Settlement Agreement specifically preserves disputes over "the national sales data upon which Honeywell relied in arriving at its usability determination." *Id.* at 425A.

The parties agree that Attachments A and B omit as "unusable" all of Tedesco's inventory and raw materials that were not part of Honeywell's product line in approximately March 2006. Tedesco challenges this methodology, claiming it violates the provision of the Settlement Agreement that required Honeywell to determine usability "in [its] discretion based on national sales." Tedesco also claims the usability determination was to be made as of the date of the AIP (August 2003), not the date of the Settlement Agreement (March 2006).

In this regard, the District Court noted that paragraph 5 of the Settlement Agreement granted Honeywell "broad discretion" to determine usability, and declared that it would not "second guess" Honeywell's exercise of that discretion. But Paragraph 5 also requires Honeywell's determination to be "based on national sales." This requirement differs from Attachment A, however, which uses Honeywell's then-current product line, not national sales data. This is not an immaterial distinction because the record indicates that Honeywell regarded its current product line and its national sales as different things. *Compare* Attachment A, App. 428A (referring to "bill of materials compliance with current HW product line" and not sales data) *with* Attachment B, *id.* at 481A (referring to "previous 6–month sales" and to "bill of materials compliance," which might refer to Honeywell's product line).

Thus, although Tedesco agreed to Attachments A and B in Paragraph 5(a) of the Settlement Agreement, the other terms of Paragraph 5 as well as the AIP would appear to require the use of a different usability criterion. Accordingly, and in light of Paragraph 11(f)'s reservation of this dispute, we find that issues of fact remain as to whether the "based on national sales" requirement remains a term of the settlement, and, if so, whether the usability determination reflected in Attach-

ments A and B complies with that requirement.

We also agree with Tedesco that factual findings are necessary to determine whether usability is to be assessed as of 2006 or 2003. Attachments A and B determine usability as of roughly the time of the Settlement Agreement, and the Settlement Agreement itself contains no provision that would require a retroactive usability analysis. Paragraph 11(e) of the Settlement Agreement, however, preserves a dispute over "who should bear the differences in prices and useability of the inventory ... associated with delay in implementing the terms of the Agreement in Principle." *Id.* at 425A. The AIP requires a usability determination similar to that provided for in the Settlement Agreement, but is silent as to whether usability was to be determined as of the time the AIP was agreed to, or as of the time of the actual transfer of the goods. If, as Tedesco maintains, the parties intended the usability determination to be immediate, then Honeywell's failure to purchase those portions of Tedesco's inventory that were usable in 2003 but not usable in 2006 would qualify as a "difference[ ] in ... useability of the inventory ... associated with delay in implementing the terms of the Agreement in Principle," *id,* which would oblige Honeywell to purchase those parts that became unusable between 2003 and 2006.

For the aforementioned reasons, we will vacate the judgment of the District Court as to Tedesco's first issue and remand for an evidentiary hearing.

**B.**

■ We next analyze Tedesco's challenge to Honeywell's pricing of the goods it repurchased. As noted above, Paragraph 5 of the Settlement Agreement re-

quires Honeywell to repurchase usable inventory "at full transfer price." *Id.* at 421A. In Attachment B, the per-unit price for each item of finished goods is marked "2003 Tx Pricing." App. 481A. Attachment B, however, also includes a notation that Honeywell's "[s]urvey of rebuilder inventory on highest quantity part # s reduces usable inventory by app. 5%." *Id.*[4] Accordingly, the last page of Attachment B reflects a five percent reduction in the total purchase price for all of Tedesco's finished goods. *Id.* at 521A. Tedesco claims this reduction is contrary to the requirement that Honeywell pay "full transfer price." The District Court, however, held that Tedesco had waived this claim because it had not explicitly reserved it in the Settlement Agreement, and that in any event it would not revisit Honeywell's discretionary pricing determinations.

We note initially that Paragraph 11(f) of the Settlement Agreement preserves disputes relating to "Honeywell's determination of the useability of the Inventory, including but not limited to *the prices used* and the national sales data upon which Honeywell relied in arriving at its usability determination." *Id.* at 425A (emphasis added). It is not clear from the face of the Settlement Agreement what is meant by this reference to "the prices used" in determining usability. The Settlement Agreement itself does not seem to contemplate the price of the goods as an element of the usability analysis, and even Honeywell's reference to its current product line does not seem to incorporate any consideration of price. Thus, it is possible that this ambiguous language refers to the *reduction* in price based on Honeywell's usability determination.

---

4. There is some question whether conducting the usability determination in this way was compatible with the "national sales" criterion that Honeywell may have been required to use. The District Court should address this question on remand.

In any event, with respect to the purchase price for the parts, the Settlement Agreement is self-contradictory: Paragraph 5 first requires the payment of "full transfer price," but Paragraph 5(a) then provides for the price reflected in Attachment B, which is something less than the full transfer price because of the usability discount. To add to the confusion, Paragraph 5(a) later states that Honeywell will purchase Tedesco's inventory "at the unit prices reflected on Attachments A and B and in accordance with the terms of this Agreement." *Id.* at 421A. As noted above, however, the unit prices in Attachment B do *not* include the disputed usability discount. For these reasons—and in light of Paragraph 11(f)'s reservation of a dispute over "the prices used" in determining usability—we find the contract ambiguous with respect to the correct purchase price, which will require the District Court to determine this issue in light of the facts developed at the evidentiary hearing.

### C.

■ We next consider whether the District Court erred when it found that Tedesco was not entitled to rebates. Tedesco claims that when the parties negotiated their schedule of transfer prices (which was before this litigation began), Honeywell agreed to pay a series of per-unit "rebates," but that the value of these rebates was not included in the price paid by Honeywell pursuant to the Settlement Agreement. Tedesco therefore contends that Honeywell has underpaid. Honeywell disagrees, contending that the transfer price was the baseline price from which the rebates were offered. The District Court found both that Tedesco had released this claim by not reserving it in the Settlement Agreement, and that it was

meritless because rebates were mentioned neither in the AIP nor in the Settlement Agreement. We agree that the per-part "transfer price" to which Tedesco agreed is unambiguously set forth in Attachments A and B to the Settlement Agreement.[5]

We further agree that, even if the AIP contemplated a different price, the parties did not reserve any dispute as to rebates in Paragraph 11 of the Settlement Agreement, and the AIP is therefore superseded on this issue pursuant to the Settlement Agreement's integration clause. Arguing to the contrary, Tedesco points to Paragraph 11(e) of the Settlement Agreement, which provides that "[t]he parties contest who should bear the difference in prices . . . associated with delay in implementing the terms of the Agreement in Principle," and to Paragraph 11(f), in which "Tedesco contests . . . the prices used . . . in arriving at [the] usability determination." *Id.* at 425A. But the rebate issue has nothing to do with either the delay in implementing the settlement or with Honeywell's usability determination. Tedesco's rebate claim would be the same regardless of whether any delay had occurred, and there is no indication that Honeywell's refusal to pay rebates on Tedesco's inventory was related to its estimation of the inventory's usability.

For the foregoing reasons, we will affirm the judgment of the District Court on this issue.

### D.

■ Tedesco also claims that Honeywell wrongfully refused to purchase its inventory of used brake shoe cores, which—according to Tedesco—qualified as "raw materials" that Honeywell promised to repurchase, subject to its usability determination. Paragraph 11(g) of the Settle-

---

**5.** Our holding that the per-unit transfer prices are unambiguously listed in Attachments A and B does not affect our conclusion that the 5% discount applied to the *total* purchase price for all parts is *not* part of the transfer price.

ment Agreement expressly preserves this dispute.

Neither the AIP nor the Settlement Agreement indicates whether returned cores should be regarded as "raw materials" (or "raw inventory," the term used in the Settlement Agreement), and no extrinsic evidence has been produced on this question. Honeywell claims that these cores are listed in Tedesco's bills of materials at a value of zero. But Honeywell does not cite the record in support of this claim, and our independent review has revealed only long lists of serial numbers and part values that do not enable us to meaningfully evaluate Honeywell's contention.[6] Tedesco, for its part, maintains that the District Court erred by not considering the trade meaning of the term "raw materials," which allegedly includes used cores. But Tedesco does not direct us to any record evidence, and we have been unable to find any, in support of its proposed meaning of the term. Accordingly, we find the contract ambiguous on this issue, which will require the District Court to make it subject to the evidentiary hearing.[7]

**E.**

We next consider Tedesco's claim that Honeywell is responsible for the costs of packing and loading the purchased goods for shipment between the parties.

Paragraph 5(b) of the Settlement Agreement requires Tedesco to "tender" inventory that is "prepared for shipment," but also contemplates that Honeywell "will conduct a physical inspection to its satisfaction of the Inventory prior to taking possession of each shipment." *Id.* at 422A. Moreover, Paragraph 5(e) requires Tedesco, "upon request [by Honeywell], to provide equipment, labor, and materials to Honeywell to facilitate the inspection, packing and loading process," and provides that Honeywell must "reimburse Tedesco for charges directly associated with this process," at specified rates. *Id.* Based on Paragraph 5(e), Tedesco argues that paying for packing and loading the goods for shipment was Honeywell's responsibility.

The parties agree that Honeywell waived its right to inspect the inventory before it took possession, so cost of inspection is not at issue. The District Court concluded that Paragraph 5(e) requires Honeywell to pay for packing and loading costs only insofar as they were necessitated by the inspection process because, it said, any other reading would essentially nullify Paragraph 5(b)'s requirements that Tedesco "tender" goods "prepared for shipment." Accordingly, the District

---

**6.** It appears that pages 522A to 670A of the Joint Appendix are Tedesco's catalogs of the parts it actually shipped to Honeywell. We are unable to discern whether this is the "bill of materials" to which Honeywell refers. In any event, the parts are cataloged only by serial number and not by name, leaving us with no way to determine which if any of the entries represent brake shoe cores. Furthermore, we have been unable to locate any part for which the per-unit price is listed as zero. Those parts that qualify as finished inventory are assigned a separately listed "Core Price," and for most parts this value is either blank or zero. But on this record we are unable to see how this is relevant to Honeywell's contention that used cores are not raw materials.

**7.** The parties dispute whether Honeywell legitimately refused to buy the cores because they were deemed unusable. Honeywell contends that one basis for its refusal to repurchase cores is its discontinuation of its core resale program in the summer of 2004—between the time of the AIP and the Settlement Agreement. As a result, Honeywell represents, it no longer has any use for used cores, and is entitled to reject them as unusable. Consistent with Tedesco's argument in its Reply Brief, however, we are unaware of any record evidence on this issue. We leave this factual issue to the District Court on remand as well.

Court held that Honeywell's waiver of its inspection rights also absolved it of any responsibility to pay for their packing and loading.

Because we find the Settlement Agreement ambiguous on this question, we disagree. In our view, the fact that the contract requires goods to be "prepared for shipment" does not necessarily address either the costs of loading the goods or all of the packing costs. Accordingly, a remand is required for the District Court to find facts as to this issue.[8]

### F.

◼ Finally, Tedesco asserts that Honeywell wrongly began servicing customers in Tedesco's exclusive area long before actually paying for the right to do so. The AIP provided that "Honeywell will pay $450,000 to Tedesco to extinguish all Tedesco's right, title and interest in the regional manufacturing and distribution agreement." App. at 336A–37A. Honeywell began servicing customers in Tedesco's region shortly after October of 2003, but did not make the required payment until June of 2006. Tedesco therefore claims that it is entitled to disgorgement of Honeywell's in-region profits for this time period.[9]

The District Court found this claim to have been released by the Settlement Agreement, and we agree. The Settlement Agreement contains no reservation for a claim of this type. Tedesco points to Paragraph 11(e), reserving disputes over "other costs associated with delay in implementing the Agreement in Principle." But the profits Honeywell earned in Tedesco's exclusive geographical region (or the profits Tedesco forewent in that region by closing its doors) cannot be characterized as one of these costs. To the contrary, the right to those profits was precisely what Tedesco ceded to Honeywell in settlement of this case. Accordingly, we will affirm the judgment of the District Court as to Tedesco's disgorgement claim.

### IV.

For the foregoing reasons, we will affirm the judgment of the District Court insofar as it exonerated Honeywell from paying rebates as part of the "full transfer price" for Tedesco's goods, and from disgorging any profits to Tedesco or compensating Tedesco for its own lost profits. In all other respects, we will vacate the District Court's judgment, and remand so the District Court can conduct an evidentiary hearing consistent with this opinion.

---

8. The District Court noted that unless the parties to a contract specify otherwise, under Pennsylvania's version of the Uniform Commercial Code, it is the seller's obligation to "transfer and deliver" sold goods. 13 Pa. Cons.Stat. § 2301. Here, however, the Settlement Agreement provides that "the Inventory shall be shipped by Honeywell or its designee to a location of its choosing." App. at 422A.

9. This is different from the relief Tedesco sought in the District Court. There, Tedesco sought restoration of "the profits [Tedesco] would have earned if Honeywell had honor[]ed its obligation." App. at 332A. Because we conclude this issue has been waived, this discrepancy in remedies sought is immaterial.